## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **HAROLD E. LEAPHART,** | : | **Civil No. 1:21-CV-1293** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **WILLIAM A. CAMPBELL, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM OPINION

### I.   Introduction

This is a *pro se* civil rights action brought by Harold Leaphart, a state prisoner incarcerated in the Pennsylvania Department of Corrections at the State Correctional Institution at Greene. Leaphart's allegations arise out of events while he was housed at both SCI Huntingdon and SCI Houtzdale. Leaphart names numerous correctional officers who he claims violated both his First and Eighth Amendment rights.

Pending before the court is a motion to dismiss filed by the defendants. (Doc. 16). The defendants argue that Leaphart has failed to plead personal involvement by correctional officers Sosak, Booher, and Long, Lieutenant Boal, and Major Barrows. The defendants further contend that all claims against the officers in their official capacity should be dismissed under the Eleventh Amendment. However, recognizing that we must interpret a *pro se* plaintiff's pleading liberally and in the

light most favorable to him as the non-moving party, for the following reasons, the defendants' motion to dismiss will be granted in part and denied in part.

## II.   <u>Background</u>

As we have noted, Leaphart's complaint alleges First and Eighth Amendment violations by staff at both SCI Huntingdon and SCI Houtzdale. (Doc. 1, ¶¶ 19, 61). With respect to the Eighth Amendment claims, the complaint alleges that on April 20, 2019, while incarcerated at SCI Huntingdon, the plaintiff was ordered to pack his belongings for transfer to the restricted housing unit ("RHU"). (<u>Id.</u>, ¶ 16). Leaphart then alleges that Defendant Campbell began to orchestrate a ruse, implying that Leaphart was disobeying an order to submit to handcuffing. (<u>Id.</u>, ¶¶ 20-23). This was followed by the arrival of what Leaphart describes as a cell extraction team, which included Defendants Kirsch, Booher, Love, Long, Sosak, and Mertts who were replete with body armor, gas masks, and OC spray. (<u>Id.</u>, ¶ 24).  According to Leaphart, Campbell ordered him to move to the cell door to be handcuffed, an order which Leaphart concedes he did not obey quickly enough. (<u>Id.</u>, ¶ 25). The plaintiff claims this pause caused Campbell to order Defendant Mertts to spray copious amounts of OC spray into Leaphart's cell. (<u>Id.</u>, ¶¶ 26-27). The spray forced Leaphart to take position on the floor of his cell, at which point the cell extraction team entered. (<u>Id.</u>, ¶¶ 29-30). Leaphart alleges that Defendant Kirsch kneeled on his back while Defendants Booher, Long, and Sosak put him into wrist and leg shackles. (<u>Id.</u>,

¶ 31). The complaint then asserts that these defendants "started to rain down blows of punches and kicks" while ordering Leaphart to stop resisting, though Leaphart alleges he was not resisting. (Id., ¶ 32). Leaphart further contends he was choked and smacked in the face numerous times, and he was put in a chokehold by Defendant Mertts. (Id., ¶¶ 34-35). The complaint alleges that Defendants Campbell and Love were present but did not intervene in the ongoing incident. (Id., ¶ 36).

After the incident with the cell extraction team, Leaphart was brought from his cell to a cell in the RHU, then moved once more to a "dry cell" in the prison's D-block. (Id., ¶¶ 40-44). The "dry cell" is described as a cell with nothing but a toilet, sink, and cement bed, with no running water or mattress. (Id., ¶ 44). Leaphart contends that though he was covered in OC spray, he was put into the "dry cell" without an opportunity to decontaminate beyond having his eyes washed. (Id., ¶¶ 41-42, 48-49). Five days later, on or about April 25, 2019, the plaintiff was released from the dry cell and subsequently submitted a sick request because of issues he alleges stemmed from the cell extraction incident. (Id., ¶¶ 50, 52).

From here, Leaphart's claims leap forward in time to January of 2020, when he is transferred from SCI Huntingdon to SCI Houtzdale. (Id., ¶ 62). The complaint implies that by this time, he had begun to pursue a civil lawsuit against the members of the cell extraction team, which he believes resulted in his transfer to Houtzdale.

(Id., ¶ 61). It is at SCI Houtzdale where Leaphart's First Amendment claims arise. (Id., ¶ 62).

For the better part of February 2020, Leaphart allegedly engaged in an ongoing dialogue with Defendant Boal over various commissary foodstuffs that had been a part of Leaphart's property while at SCI Huntingdon. (Id., ¶¶ 63-68). The complaint asserts that Boal had previously been a correctional officer at SCI Huntingdon. (Id., ¶ 66). Leaphart alleges that Defendant Boal took the items from his property and would not return them. (Id., ¶¶ 72-73, 76). This caused Leaphart to file an inmate grievance against Defendant Boal on February 20, 2020. (Id., ¶ 76). Leaphart further contends that Boal announced to other inmates on the block that Leaphart was a "rat" because he had filed a lawsuit against officers at SCI Huntingdon. (Id., ¶ 78).

Sometime after Leaphart filed a grievance against Boal, Boal allegedly offered Leaphart his choice of food items in return for Leaphart's withdrawal of the grievance. (Id., ¶¶ 80-84). Leaphart claims that he agreed to this offer, and his cell was later filled with the food. (Id., ¶¶ 84-85). Leaphart contends that he tried to explain this quid pro quo to his counselor but was rebuffed. (Id., ¶¶ 85-86). Instead, Leaphart alleges that he was given the option of either signing the grievance withdrawal, giving back the food, or receiving a misconduct for lying. (Id.) According to Leaphart, he opted to sign the withdrawal under duress. (Id.)

In March of 2020, Leaphart alleges that he attempted to address issues related to these experiences at SCI Houtzdale with Defendant Major Barrows, while Barrows was walking past his cell. (Id., ¶ 88). Leaphart claims Defendant Barrows implied that continuing to write grievances would ensure that the Program Review Committee ("PRC") would not grant any privileges to Leaphart. (Id., ¶¶ 88-90). The complaint indicates that at that time, Defendant Barrows was a member of the PRC and had a say in whether privileges should be granted. (Id., ¶ 91). Leaphart alleges that while he remained misconduct-free, he was not afforded any privileges. (Id., ¶¶ 94, 106).

Leaphart subsequently filed this action in the United States District Court for the Middle District of Pennsylvania on July 23, 2021. (Doc. 1). In his complaint, he alleges violations of his First and Eight Amendment rights under 42 U.S.C. § 1983 arising from his cell extraction, and treatment at SCI Houtzdale. On October 5, 2021, the defendants moved to dismiss the complaint, arguing a lack of personal involvement by a number of the named officers, as well as Eleventh Amendment immunity as to all official capacity claims. (Doc. 17). This motion is fully briefed and ripe for resolution. (Docs. 17, 21, 22, 23). For the reasons set forth below, the defendants' motion to dismiss will be granted in part and denied in part.

## III.   Discussion

### A. Motion to Dismiss – Standard of Review

A motion to dismiss tests the legal sufficiency of a complaint. It is proper for the court to dismiss a complaint in accordance with Rule 12(b)(6) of the Federal Rules of Civil Procedure only if the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). With respect to this benchmark standard for the legal sufficiency of a complaint, the United States Court of Appeals for the Third Circuit has aptly noted the evolving standards governing pleading practice in federal court, stating that:

> Standards of pleading have been in the forefront of jurisprudence in recent years. Beginning with the Supreme Court's opinion in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), continuing with our opinion in Phillips [v. County of Allegheny, 515 F.3d 224, 230 (3d Cir. 2008)], and culminating recently with the Supreme Court's decision in Ashcroft v. Iqbal, BU.S.B, 129 S. Ct. 1937 (2009), pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss.

Fowler v. UPMC Shadyside, 578 F.3d 203, 209-10 (3d Cir. 2009).

In considering whether a complaint fails to state a claim upon which relief may be granted, the court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom are to be construed in the light most favorable to the plaintiff. Jordan v. Fox, Rothschild, O'Brien & Frankel, Inc., 20 F.3d 1250, 1261 (3d Cir. 1994). However, a court "need not credit a complaint's

bald assertions or legal conclusions when deciding a motion to dismiss." Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). Additionally, a court need not "assume that a . . . plaintiff can prove facts that the . . . plaintiff has not alleged." Associated Gen. Contractors of Cal. v. California State Council of Carpenters, 459 U.S. 519, 526 (1983). As the Supreme Court held in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), in order to state a valid cause of action, a plaintiff must provide some factual grounds for relief which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of actions will not do." Id., at 555. "Factual allegations must be enough to raise a right to relief above the speculative level." Id.

In keeping with the principles of Twombly, the Supreme Court has underscored that a trial court must assess whether a complaint states facts upon which relief can be granted when ruling on a motion to dismiss. In Ashcroft v. Iqbal, 556 U.S. 662 (2009), the Supreme Court held that, when considering a motion to dismiss, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id., at 679. According to the Supreme Court, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id., at 678. Rather, in conducting a review of the adequacy of a complaint, the Supreme Court has advised trial courts that they must:

> [B]egin by identifying pleadings that because they are no more than
> conclusions are not entitled to the assumption of truth. While legal
> conclusions can provide the framework of a complaint, they must be
> supported by factual allegations. When there are well-pleaded factual
> allegations, a court should assume their veracity and then determine
> whether they plausibly give rise to an entitlement to relief.

Id., at 679.

Thus, following Twombly and Iqbal, a well-pleaded complaint must contain

more than mere legal labels and conclusions; it must recite factual allegations

sufficient to raise the plaintiff's claimed right to relief beyond the level of mere

speculation. As the United States Court of Appeals for the Third Circuit has stated:

> [A]fter Iqbal, when presented with a motion to dismiss for failure to
> state a claim, district courts should conduct a two-part analysis. First,
> the factual and legal elements of a claim should be separated. The
> District Court must accept all of the complaint's well-pleaded facts as
> true, but may disregard any legal conclusions. Second, a District Court
> must then determine whether the facts alleged in the complaint are
> sufficient to show that the plaintiff has a "plausible claim for relief." In
> other words, a complaint must do more than allege the plaintiff's
> entitlement to relief. A complaint has to "show" such an entitlement
> with its facts.

Fowler, 578 F.3d at 210-11.

As the Court of Appeals has observed:

> The Supreme Court in Twombly set forth the "plausibility" standard for
> overcoming a motion to dismiss and refined this approach in Iqbal. The
> plausibility standard requires the complaint to allege "enough facts to
> state a claim to relief that is plausible on its face." Twombly, 550 U.S.
> at 570, 127 S. Ct. 1955. A complaint satisfies the plausibility standard
> when the factual pleadings "allow[ ] the court to draw the reasonable
> inference that the defendant is liable for the misconduct alleged." Iqbal,
> 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556, 127 S. Ct. 1955).
> This standard requires showing "more than a sheer possibility that a

defendant has acted unlawfully." <u>Id.</u> A complaint which pleads facts "merely consistent with" a defendant's liability, [ ] "stops short of the line between possibility and plausibility of 'entitlement of relief.' "

<u>Burch v. Milberg Factors, Inc.</u>, 662 F.3d 212, 220-21 (3d Cir. 2011), <u>cert. denied</u>, 132 S. Ct. 1861 (2012).

In practice, consideration of the legal sufficiency of a complaint entails a three-step analysis:

First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." <u>Iqbal</u>, 129 S. Ct. at 1947. Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." <u>Id.</u>, at 1950. Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

<u>Santiago v. Warminster Twp.</u>, 629 F.3d 121, 130 (3d Cir. 2010) (quoting <u>Iqbal</u>, 129 S. Ct. at 1950).

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. <u>Sands v. McCormick</u>, 502 F.3d 263, 268 (3d Cir. 2007). The court may also consider "undisputedly authentic document[s] that a defendant attached as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." <u>Pension Benefit Guar. Corp. v. White Consol. Indus.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993). Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be

considered." <u>Pryor v. Nat'l Collegiate Athletic Ass'n</u>, 288 F.3d 548, 560 (3d Cir. 2002); <u>see also</u> <u>U.S. Express Lines, Ltd. v. Higgins</u>, 281 F.3d 382, 388 (3d Cir. 2002) (holding that "[a]lthough a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss in one for summary judgment"). However, the court may not rely on other parts of the record in determining a motion to dismiss, or when determining whether a proposed amended complaint is futile because it fails to state a claim upon which relief may be granted. <u>Jordan v. Fox, Rothschild, O'Brien & Frankel</u>, 20 F.3d 1250, 1261 (3d Cir. 1994).

With our discretion and judgment cabined and confined by the well-pleaded allegations in this complaint, we turn to an assessment of the legal sufficiency of Leaphart's averments.

**B.  <u>The Motion to Dismiss Should Be Granted in Part and Denied in Part.</u>**

**1.  <u>The Defendants' Motion to Dismiss Should Be Denied with Respect to the Eighth Amendment Claims.</u>**

In their motion to dismiss, the defendants contend that Leaphart has not alleged any personal involvement by officers Sosak, Booher, and Long with regards to his Eight Amendment excessive force claim stemming from the cell extraction. (Doc. 17, at 4). Thus, the defendants believe that Leaphart's Eight Amendment claims against these three named officers should be dismissed. (<u>Id.</u>) We disagree.

It is well settled that "a defendant in a civil rights action must have personal involvement in the alleged wrongs." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) (citing Parratt v. Taylor, 451 U.S. 527, 537 n.3 (1981)). Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence but cannot be solely predicated on the operation of *respondeat superior*. Rode, 845 F.2d at 1207–08. A complaint may adequately allege a defendant's personal direction, or actual knowledge and acquiescence by "alleg[ing] the particulars of 'conduct, time, place, and persons responsible,' " and must allege more than a "mere hypothesis" that the defendant had knowledge or involvement in the incident. Muhammad v. Martin, No. 3:19-CV-1316, 2021 WL 832645, at *5 (M.D. Pa. Mar. 4, 2021) (quoting Evancho v. Fisher, 423 F.3d at 354; Rode, 845 F.2d at 1207-08).

The Eighth Amendment to the United States Constitution prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. In the prison context, the Supreme Court of the United States has stated that only "the unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment." Whitley v. Albers, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (quoting Ingraham v. Wright, 430 U.S. 651, 670, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (internal quotations omitted)). This Eighth Amendment prohibition extends to the use of excessive force by correctional officers upon prison inmates, Hudson v.

McMillian, 503 U.S. 1, 6-7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992), as well as a failure to protect inmates from the use of excessive force. Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

However, not every incident in which a prison guard uses force will give rise to a claim under the Eighth Amendment. Hudson, 503 U.S. at 9, 112 S.Ct. 995. A plaintiff asserting a claim of excessive force against a correctional officer must show that the force was applied " 'maliciously and sadistically for the very purpose of causing harm' instead of 'in a good faith effort to maintain or restore discipline.' " Robinson v. Danberg, 673 F. App'x 205, 211 (3d Cir. 2016) (quoting Hudson, 503 U.S. at 6, 112 S.Ct. 995). Several factors should be considered to determine if force used by the official violates the Eighth Amendment:

> (1) the need for the application of force, (2) the relationship between the need and the amount of force that was used, (3) ... the extent of the injury inflicted, ... (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials, ... and (5) any efforts made to temper the severity of a forceful response.

Whitley, 475 U.S. at 321, 106 S.Ct. 1078 (internal quotations and citations omitted).

Our inquiry thus turns on whether Leaphart's complaint alleges sufficient facts showing the personal involvement of these defendants that are more than mere hypothesis. The plaintiff's complaint claims several of the named defendants were part of a cell extraction team that participated in an assault on Leaphart at SCI Huntingdon. (Doc. 1, ¶ 24). For their part, the defendants argue that with respect to

Officers Sosak, Booher, and Long, Leaphart has failed to allege any personal involvement. (Doc. 17, at 5). However, the defendants appear to hold Leaphart to a higher standard than is necessary at this stage of the litigation. While Leaphart's complaint does not describe the minutiae of every defendant's exact actions during this alleged assault, he does provide the name and role of every member of the cell extraction team, including Sosak, Booher, and Long. (Doc. 1, ¶ 24). Leaphart identifies all three, clad in body armor, as entering the cell after he was OC sprayed, handcuffing him, then participating in the alleged assault that followed. (Id., ¶¶ 25-35).

Examining these pleadings in the light most favorable to the plaintiff, we find that Leaphart has set forth sufficient factual allegations implicating these defendants in the alleged Eighth Amendment violation. When read together, paragraphs 31 and 32 of the complaint identify the members of the team who entered the cell by name and then allege that "*they* started to rain down blows…" (Doc. 1, ¶¶ 31-32) (emphasis added). Leaphart's recitation of the incident involves no conclusory language, but instead a grouping of factual allegations that claim the conduct, time, place, and persons responsible for his alleged assault. Viewing the complaint liberally, as we are obliged to do in the case of *pro se* plaintiffs, it is more than "mere hypothesis" that Sosak, Booher, and Long were on the cell extraction team that entered Leaphart's cell, restrained him, and then struck him on April 20, 2019.

Indeed, the Third Circuit has found that an assault perpetuated after an inmate was handcuffed and restrained could be sufficient to reach an Eighth Amendment violation. See e.g., Shelton v. Bledsoe, 522 F. App'x 109, 112 (3d Cir. 2013). The facts as pleaded by Leaphart similarly support an Eighth Amendment excessive force cause of action against defendants Sosak, Booher, and Long at this stage of the litigation.

To the extent that Leaphart failed to tie the specific blows to Sosak, Booher, and Long with any greater particularity, the correctional officers' presence in the cell while Leaphart received these claimed blows form the basis of a related Eighth Amendment cause of action based upon a failure to intervene. Indeed, the Third Circuit has considered the question of whether a prison correctional officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force, even if the excessive force is employed by a superior. Smith v. Mensinger, 293 F.3d 641 (3d Cir. 2002). Upon consideration of the issue, the Third Circuit held "that a corrections officer's failure to intervene in a beating can be the basis of liability for an Eighth Amendment violation under § 1983 if the corrections officer had a reasonable opportunity to intervene and simply refused to do so." Id. at 650. In addition, the court held that "a corrections officer cannot escape liability by relying upon his inferior or non-supervisory rank vis-a-vis the other officers." Id.

In reaching this holding, the Court took care to explain that "the duty to uphold the law does not turn upon an officer's rank ... [and] is neither affected by, nor proportional to, a non-intervening officer's relationship to an offending colleague." Id. at 651. The Court emphasized the reason for its conclusion, and expressed its substantial concern with the failure of a police or corrections officer to intervene to prevent excessive force, as follows:

> The approving silence emanating from the officer who stands by and watches as other unleash an unjustified assault contributes to the actual use of excessive force, and we cannot ignore the tacit support such silence lends to those who are actually striking the blows. Such silence is an endorsement of the constitutional violation resulting from the illegal use of force. It is incompatible with the restrictions imposed under the Eighth Amendment, and is therefore unacceptable. We will not immunize such conduct by suggesting that an officer can silently contribute to such a constitutional violation and escape responsibility for it. The restriction on cruel and unusual punishment contained in the Eighth Amendment reaches non-intervention just as readily as it reaches the more demonstrable brutality of those who unjustifiably and excessively employ fists, boots or clubs.

Id. (footnote omitted)

Thus, Smith held that corrections officers may be liable under § 1983 for failing to intervene in an instance of excessive force if they had a reasonable opportunity to do so. A valid failure to intervene claim requires: (1) the officer had a duty to intervene; (2) the officer had the opportunity to intervene; and (3) the officer failed to intervene. Smith, 293 F.3d at 650-51. In Smith there was evidence that a corrections officer witnessed a fellow officer beat the inmate plaintiff. The

Third Circuit found this was sufficient for a fact finder to conclude the officer knew of the excessive force being used, had an opportunity to intervene, but refused to do so. Id. at 652. The Court reasoned that corrections officers are sworn to uphold the law and are authorized to use force toward that end; however, the law does not condone the use of excessive force. Id. at 651.

Here, the defendants contest personal involvement by Officers Sosak, Booher, and Long on the basis that plaintiff has not alleged individual strikes against him with any particularity. While we believe complaint paragraphs 31 and 32 do just this and are therefore dispositive of the question of the defendants' personal involvement, we additionally note that, according to Smith, placing the named officers in the cell while Defendant Kirsch placed the shackled plaintiff in a choke hold is sufficient to state a claim against these officers for failing to intervene. As fellow corrections officers sworn to uphold the law, Sosak, Booher, and Long had a duty to intervene when Kirsch allegedly used excessive force in violation of the Eighth Amendment. According to the complaint, at the moment of the alleged assault, each officer was proximally close enough to intervene but all failed to act, even though it was their duty to do so.

Accordingly, because we have found that Leaphart has sufficiently alleged the personal involvement of these defendants in his Eighth Amendment claim, either as

an excessive force claim or in the alternative as a failure to intervene claim, the defendants' motion to dismiss this claim against these defendants will be denied.

## 2. **The Defendants' Motion to Dismiss Should Be Denied with Respect to First Amendment Claims.**

The defendants further argue that the plaintiff's First Amendment retaliation claims against Lt. Boal and Major Barrows should be dismissed for lack of personal involvement. (Doc. 17, at 5). Leaphart's First Amendment claims relate to his post-cell extraction experiences after being transferred from SCI Huntingdon to SCI Houtzdale. The plaintiff claims separate incidents of retaliation for the complaints he filed at SCI Huntingdon. (Doc. 1, ¶ 61).

A prisoner claiming that prison officials have retaliated against him for exercising his constitutional rights must first prove: (1) the conduct in which he engaged was constitutionally protected; (2) he suffered adverse action at the hands of prison officials; and (3) his constitutionally protected conduct was a substantial motivating factor in the defendants' conduct. Carter v. McGrady, 292 F.3d 152, 158 (3d Cir. 2002). With respect to the obligation to demonstrate that he suffered an adverse action, a plaintiff must demonstrate that he suffered action that "was sufficient to deter a person of ordinary firmness from exercising his rights." Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000). However, it is well settled that *de minimis* actions do not rise to the level of constitutionally cognizable retaliation. Thaddeus-X v. Blatter, 175 F.3d 378, 396 (6th Cir. 1999) ("It is not necessarily true,

however, that every action, no matter how small, is constitutionally cognizable"). As

one court has observed:

> The *de minimis* standard . . . achieves the proper balance between the
> need to recognize valid retaliation claims and the danger of "federal
> courts embroil[ing] themselves in every disciplinary act that occurs in
> state penal institutions." Woods, 60 F.3d at 1166. The purpose of
> allowing inmate retaliation claims under § 1983 is to ensure that
> prisoners are not unduly discouraged from exercising constitutional
> rights. See Crawford-El, 523 U.S. at 588 n. 10, 118 S. Ct. 1584. Some
> acts, though maybe motivated by retaliatory intent, are so *de minimis*
> that they would not deter the ordinary person from further exercise of
> his rights. Such acts do not rise to the level of constitutional violations
> and cannot form the basis of a § 1983 claim.

Morris v. Powell, 449 F.3d 682, 686 (5th Cir. 2006). See, e.g., Pope v. Bernard, No.

10 1443, 2011 U.S. App. LEXIS 2764, 2011 WL 478055, at *2 (1st Cir. Feb. 10,

2011).

The third essential element to a retaliation claim is that there be a causal link

between the exercise of a constitutional right and the adverse action taken against

the prisoner. Rauser, 241 F.3d at 333-34. To establish this third, and crucial,

component to a constitutional retaliation claim, causation, Leaphart must make an

exacting showing. In this setting:

> To establish the requisite causal connection a plaintiff usually must
> prove either (1) an unusually suggestive temporal proximity between
> the protected activity and the allegedly retaliatory action, or (2) a
> pattern of antagonism coupled with timing to establish a causal link.
> See Krouse v. American Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir.
> 1997); Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir.

1997). In the absence of that proof the plaintiff must show that from the "evidence gleaned from the record as a whole" the trier of the fact should infer causation. <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 281 (3d Cir. 2000).

<u>Lauren W. ex rel. Jean W. v. DeFlaminis</u>, 480 F.3d 259, 267 (3d Cir. 2007).

Moreover, when examining these causation issues, we are specifically admonished that:

> A court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate. Consequently, a putative plaintiff by engaging in protected activity might be able to insulate himself from actions adverse to him that a public actor should take. The point we make is not theoretical as we do not doubt that public actors are well aware that persons disappointed with official decisions and actions frequently bring litigation against the actors responsible for the decisions or actions in their individual capacities, and the actors surely would want to avoid such unpleasant events. Thus, it would be natural for a public actor to attempt to head off a putative plaintiff with the unwarranted expenditure of public funds. Courts by their decisions should not encourage such activity and, by enforcing the requirement that a plaintiff show causation in a retaliation case, can avoid doing so as they will protect the public actor from unjustified litigation for his appropriate conduct. In this regard we recognize that often public actors such as those in this case must make a large number of decisions in charged atmospheres thereby inviting litigation against themselves in which plaintiffs ask the courts to second guess the actors' decisions.

<u>Id.</u> at 267-68.

Mindful of these concerns, courts have in the past carefully scrutinized inmate claims of retaliation premised solely on circumstantial proof of a temporal proximity

between the plaintiff's conduct and allegedly retaliatory acts. Indeed, this Court has

spoken directly to the issue of what must be shown to state a valid complaint in this

factual context, noting that:

> To establish the causation element of a retaliation claim, a plaintiff must prove that his or her participation in a protected activity motivated the defendant to perform the retaliatory act. Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir. 2002); Meenan v. Harrison, Civ. A. No. 3:03-CV-1300, 2006 WL 1000032, at *4 (M.D. Pa. Apr. 4, 2006) (observing that a plaintiff must demonstrate that the exercise of First Amendment rights "played some substantial role" in the defendant's action). The temporal proximity of a retaliatory act to a plaintiff's exercise of his or her First Amendment rights is probative, but not dispositive, of the causation element. Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir. 2003); see also Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997) (stating that "temporal proximity merely provides an evidentiary basis from which an inference can be drawn"). For temporal proximity alone to establish causation, the "timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred." Marasco, 318 F.3d at 512 (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997)) . . . [T]he Third Circuit Court of Appeals has suggested that a temporal proximity of two days is sufficient to establish causation, see Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 & n. 5 (3d Cir. 2000), whereas a temporal proximity of ten days is sufficient to establish causation only when accompanied by other evidence of . . . wrongdoing, Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 (3d Cir. 2003). This suggests that the temporal proximity must be measured in days, rather than in weeks or months, to suggest causation without corroborative evidence.

Conklin v. Warrington Tp., No. 06-2245, 2009 WL 1227950, *3 (M.D. Pa. April 30,

2009).

Applying this standard, courts in civil rights cases have frequently rebuffed speculative efforts to infer causation from temporal proximity when a span of weeks or months separated the plaintiff's constitutionally protected conduct from the defendants' alleged acts of retaliation. Thus, "[o]ur sister courts have held that a temporal proximity of as little as seventeen days was insufficient to establish causation." Fischer v. Transue, 04-2756, 2008 WL 3981521, *10 (M.D. Pa. Aug. 22, 2008) (collecting cases and holding that temporal proximity of three weeks was insufficient to establish causation) (cleaned up).

Turning to the plaintiff's claims against Boal, Leaphart describes a two-week period in February of 2020 during which time his commissary food items went missing after being taken by Boal. (Doc. 1, ¶¶ 63-73). He further avers that when he attempted to talk to Boal about this, Boal refused and pointed to the plaintiff's lawsuit against Boal's former coworkers at SCI Huntingdon as the reason for his refusal. (Id., ¶¶ 77-79). After Leaphart filed a grievance against Boal for the missing food items, he alleges that Boal attempted to bribe him with equivalent items in exchange for Leaphart retracting the grievance. (Id., ¶¶ 81-84). Leaphart acquiesced and eventually retracted the grievance after his counselor pointed out that failing to retract would lead to a misconduct for lying to a correctional officer. (Id., ¶¶ 85-87).

It is well established that the filing of lawsuits and grievances is protected conduct under the First Amendment. Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir.

2003). Thus, inmates claiming retaliation for their filing of grievances must prove that they suffered adverse action by prison officials sufficient to deter a person of ordinary firmness from exercising this right. O'Donnell v. Pennsylvania Dep't of Corr., 790 F. Supp. 2d 289, 303 (M.D. Pa. 2011). One court in this district has previously held that the confiscation of personal property may constitute adverse action "if motivated solely by a retaliatory motive." Page-Jones v. Berfield, No. 1:20-CV-1042, 2021 WL 5906107, at *6 (M.D. Pa. Dec. 14, 2021) (quoting Hernández-Tirado v. Lowe, No. 3:14-cv-1897, 2017 WL 3433690, at *10 (M.D. Pa. Aug. 10, 2017). Reading the *pro se* complaint liberally, the plaintiff claims that Boal's treatment of him stems from Leaphart's lawsuits against SCI Huntingdon correctional officers, who Boal referred to as "his guys." (Doc. 1, ¶ 78). Leaphart contends that Boal, motivated by these lawsuits, took the food which the plaintiff had purchased from the commissary then used it to stymie his further filing of grievances. (Id., ¶¶ 81-84).

Leaphart alleges a series of events that begins with his filing of grievances and ends with his property being taken. (Id., ¶ 61-73). Boals' alleged comments towards Leaphart's filing of grievances, and the temporal proximity of Boals' actions to these comments suggests that Boals was motivated to act by Leaphart's protected conduct. (Id., ¶¶ 78, 81-84). Accepting the plaintiff's allegations as true,

as we must at this stage, we find the plaintiff has sufficiently pleaded personal involvement by Boals to support a First Amendment claim for retaliation.

Leaphart's retaliation claim against Major Barrows features a more straightforward series of events. (Doc. 1, ¶¶ 88-99). Leaphart claims that after his experiences with Boals, he told Major Barrows that it was his ambition to "move forward with a fresh start." (Id., ¶ 89). Major Barrows responded by telling the plaintiff that he should "fall back and don't write a bunch of grievances," implying that all internal PRC requests from Leaphart would be denied if he continued to do so. (Id., ¶ 90). Leaphart avers that at the time, Major Barrows was a member of the PRC, and that the PRC was responsible for setting the criteria of the plaintiff's privileges and the timeframe for changes to his Administrative Custody status. (Id., ¶ 91). The plaintiff responded to this perceived threat by filing a grievance against Major Barrows. (Id., ¶ 92). Leaphart then claims that even though he had a misconduct-free record since his filing, he received no privileges from the PRC. (Id., ¶¶ 92, 94).

Here again, Leaphart claims that he participated in protected conduct by filing grievances against Major Barrows. (Id., ¶ 93). Standing alone, a blanket denial of privileges while in administrative confinement does not normally create an actionable liberty interest. Allah v. Seiverling, 229 F.3d 220, 224 (3d Cir. 2000). However, if these denials are motivated by a desire to punish an individual for

exercising a constitutional right, they may form the basis of a constitutional tort. McLaughlin v. Hart, No. 1:13-CV-2851, 2015 WL 13738991, at *12 (M.D. Pa. July 15, 2015). Leaphart alleges that Barrows tied Leaphart's treatment while in administrative confinement to his protected conduct of filing grievances. (Doc. 1, ¶ 90). Thus, based solely upon the pleadings it can be inferred that if Leaphart continued to exercise his First Amendment right to avail himself of the grievance process, Major Barrows would prevent Leaphart from receiving any requested privileges from the PRC. While the denial of requested privileges alone does not give rise to a First Amendment violation, the plaintiff's allegations that Major Barrows' denials were designed to prevent him from engaging in a protected activity are sufficient to maintain such a claim at this stage. Further, the plaintiff supports these allegations by alleging Major Barrows' own statements of intention, removing any doubt about the causality of his denials and what they were designed to do.

Taking these allegations as true, as we must at this stage of the litigation, we find that Leaphart has pleaded sufficient allegations of retaliation with respect to Major Barrows. The question of whether Leaphart can prove what he has pled must await another day, and another proceeding. Accordingly, the defendants' motion to dismiss this First Amendment claim will be denied.

### 3.  The Defendants' Motion Should be Granted With Respect to Plaintiff's Eleventh Amendment Official Capacity Claims.

Finally, the defendants contend that any claims brought against them in their official capacity should be dismissed, as these claims are barred by the Eleventh Amendment. As a matter of constitutional law, the Eleventh Amendment to the Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the . . States . . . " U.S. Const. amend XI. By its terms, the Eleventh Amendment strictly limits the power of federal courts to entertain cases brought by citizens against the state and state agencies. Moreover, a suit brought against an individual acting in his or her official capacity constitutes a suit against the state and therefore also is barred by the Eleventh Amendment. Will v. Michigan Dept. of State Police, 491 U.S. 58 (1989).

Pursuant to the Eleventh Amendment, states, state agencies, and state officials who are sued in their official capacity are generally immune from lawsuits in federal courts brought against them by citizens. Seminole Tribe v. Florida, 517 U.S. 44, 54 (1996). This proscription directly applies here:

> Because the Commonwealth of Pennsylvania's Department of Corrections is a part of the executive department of the Commonwealth, see Pa. Stat. Ann., tit. 71, ' 61, it shares in the Commonwealth's Eleventh Amendment immunity. Such immunity, . . . , may be lost in [only] one of two ways: (1) if the Commonwealth waived its immunity; or (2) if Congress abrogated the States' immunity pursuant to a valid

exercise of its power. <u>See</u> <u>College Sav. Bank</u>, 527 U.S. at 670, 119 S.
Ct. 2219; <u>Atascadero State Hosp. v. Scanlon</u>, 473 U.S. 234, 240-41,
105 S.Ct. 3142, 87 L.Ed.2d 171 (1985).

<u>Lavia v. Pennsylvania, Dept. of Corr.</u>, 224 F.3d 190, 195 (3d Cir. 2000).

Under the Eleventh Amendment, the Commonwealth's immunity exists as a
matter of law unless waived by the state, or expressly and unequivocally abrogated
by Congress. In this case, it is clear that Congress has not expressly abrogated this
constitutional immunity with respect to federal civil rights lawsuits against the
Commonwealth of Pennsylvania Department of Corrections, and the
Commonwealth clearly has not waived its immunity. <u>See</u> <u>Lavia</u>, 224 F.3d at 195.
Quite the contrary, the Commonwealth has specifically by statute invoked its
Eleventh Amendment immunity in 42 Pa. Cons. Stat. § 8521(b). Thus, while
Pennsylvania has, by law, waived sovereign immunity in limited categories of cases
brought against the Commonwealth in state court, <u>see</u> 42 Pa. Cons. Stat. § 8522,
Section 8521(b) flatly states that: "Nothing contained in this subchapter shall be
construed to waive the immunity of the Commonwealth from suit in federal courts
guaranteed by the Eleventh Amendment to the Constitution of the United States." §
8521(b). Moreover, beyond these constitutional considerations, as a matter of
statutory interpretation, the plaintiff cannot bring a damages action against the
Commonwealth since it is also well settled that a state, a state agency, or a state

official acting in an official capacity is not a "person" within the meaning of 42 U.S.C. § 1983, the principal federal civil rights statute. Will, 491 U.S. at 71.

These basic legal tenets apply here and are fatal to the plaintiff's damages claims against these state defendants in their official capacities. In sum, as to these state officials, these federal civil rights claims for damages based upon official capacity claims are barred by the Eleventh Amendment to the United States Constitution. Therefore, since the state and its officials cannot be sued in this fashion in federal court, these claims should be dismissed. However, Leaphart may maintain these damages claims against the defendants in their individual capacities.

## IV.   Conclusion

Accordingly, for the foregoing reasons, the defendants' motion to dismiss (Doc. 16), will be GRANTED as to claims against the defendants in their official capacities, but DENIED in all other respects.

An appropriate order follows.


                                        _s/ Martin C. Carlson_
                                        Martin C. Carlson
                                        United States Magistrate Judge

DATED: April 19, 2022