## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **HAROLD LEAPHART,** | : | **Civil No. 1:21-CV-1293** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **WILLIAM CAMPBELL, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM OPINION

I. **Introduction**

This *pro se* prisoner civil rights lawsuit case comes before us on a motion for summary judgment filed by two correctional defendants, Joel Barrows and Kenneth Boal. (Doc. 42).[1] With respect to these defendants, the plaintiff, Harold Leaphart, has filed a complaint alleging that these defendants retaliated against him because he exercised his right to lodge grievances against them and other correctional staff. However, upon consideration of the factual background of these claims, which largely undermines any allegations of retaliation, for the reasons set forth below we will grant this motion for summary judgment.

---

[1] The remaining correctional defendants in this case have filed a summary judgment motion (Doc. 45) which we will address separately.

II.   **Statement of Facts and of the Case**

Harold Leaphart is a state inmate and a prior litigant in this court. In the instant case Leaphart is suing nine correctional officials at two separate state correctional institutions, alleging that these officials violated Leaphart's constitutional rights in a variety of ways. (Doc. 1). While the primary thrust of Leaphart's complaint relates to matters which he alleges took place at the State Correctional Institution (SCI) Huntingdon, two prison officials, Lieutenant Kenneth Boal and Major Joel Barrows, are being sued by Leaphart for alleged actions arising out of his confinement at SCI Houtzdale between January and November of 2020. (Id., ¶¶ 61-108).

A. **Factual Background Regarding the Defendants' Alleged Conduct**

Leaphart's claims against Defendants Boal and Barrows are cast in the nature of First Amendment retaliation claims; however, the chronology of events which Leaphart has provided in his complaint in many respects do not lend themselves to supporting viable retaliation claims. For example, with regard to Defendant Boal the complaint alleges that on February 8, 2020, shortly after Leaphart was transferred to the Restricted Housing Unit (RHU) at SCI Houtzdale, his inmate property was inventoried and certain commissary foodstuff items which Leaphart alleges he had previously been authorized to possess were earmarked for confiscation. (Id., ¶¶ 63-65). Leaphart protested this confiscation and Lieutenant Boal was summoned to meet with the plaintiff. (Id., ¶¶ 65-66).

According to the complaint Boal spoke with Leaphart reassuring him that "I will place your food items in my office here . . . nobody will bother it." (Id., ¶ 68). Several days later, Leaphart was approved to have commissary food items in his cell, (Id., ¶ 69); however, when a search was conducted for Leaphart's foodstuffs they could not be located. (Id., ¶¶ 70-75).

Dissatisfied, Leaphart filed a grievance on February 20, 2020 against defendant Boal citing the loss of these commissary items which he valued at $29.40. (Id., ¶ 76, Doc. 43-3, at 3). According to Leaphart, several days later he had a verbal exchange with Boal in which Boal used some epithets, calling him a "rat" or "snitch." (Doc. 1, ¶¶ 77-79). However, on February 24, 2020, Boal met with Leaphart to discuss this grievance. (Id., ¶¶ 81-85). At that time, according Leaphart, Lieutenant Boal showed Leaphart a footlocker filled with food items, and offered to replace Leaphart's lost foodstuffs in return for resolving this grievance informally, stating: "What would you like out of these items of food for you to sign an [sic] grievance withdrawal form . . . ?" (Id., ¶ 82). Boal informed Leaphart, "if you'd like you can have all of this s[tuff]." (Id., ¶ 83). Lieutenant Boal then asked, "do we have a deal or what," to which Leaphart nodded his assent. (Id., ¶ 84). Boal replied, "Good I'll have this placed in your cell for you." (Id.) Lieutenant Boal was true to his word. When Lepahart returned to his cell these replacement foodstuffs were placed on his bed. (Id., ¶ 85). Approximately one week later, Leaphart alleges that a non-party

prison counselor came to his cell to have him sign off on a form withdrawing his grievance. (Id., ¶ 85). At that time, even though prison officials had lived up to their agreement to replace Leaphart's missing food items, Leaphart alleges that he balked at the notion of withdrawing his grievance. Ultimately, Leaphart avers that he signed the form withdrawing the grievance "under duress." (Id., ¶ 86).

Remarkably, this incident—in which Leaphart acknowledges that Lieutenant Boal thoroughly addressed his grievance about the loss of $29.40 in foodstuffs by making arrangements to provide the plaintiff with replacement food items in return for the inmate agreeing to withdraw the grievance—forms the entire basis for Leaphart's constitutional tort claim against Defendant Boal.

As for Defendant Barrows, there is a similarly challenging quality to Leaphart's factual narrative in support of his First Amendment retaliation claim. With respect to Defendant Barrows, the gravamen of Leaphart's complaint revolves around two verbal exchanges which were separated by several months coupled with what appears to have been chronologically an unrelated matter—a brief delay in Leaphart gaining access to a tablet.

Leaphart's complaint avers that the plaintiff had a conversation with Barrows on March 4, 2020 during which he complained that his housing unit was a "grind up pod" where RHU inmates experienced harsh conditions. (Id., ¶¶ 88, 89). According to Leaphart during this conversation Barrows allegedly advised the plaintiff to "fall

back," refrain from submitting grievances, and assured Leaphart that he would not receive favorable treatment while in the RHU. (Id., ¶ 90).

Leaphart alleges that he grieved this response by Barrows which he deemed to be threatening. (Id., ¶ 92). Leaphart also asserts without any further detail that the institution's Program Review Committee (PRC) denied him access to various privileges associated with his prison status. (Id., ¶ 92). However, the only specific example of this alleged conduct cited by Leaphart was the denial of a request for a tablet, an event which Leaphart concedes took place a few weeks prior to filing any grievance. (Id., ¶ 105). Moreover, it is undisputed that Leaphart was in fact approved to possess a tablet in the RHU at SCI Houtzdale on July 16, 2020. (Doc. 43, ¶ 22). Thus, the only concrete example of an adverse action cited by Leaphart—the alleged denial of a tablet—is actually contradicted by the uncontested evidence.

Beyond this March 4, 2020 verbal exchange, Leaphart's complaint describes a second encounter with Barrows which took place some two months later, on May 13, 2020. At that time, Leaphart interrupted Barrows who was speaking with another inmate. (Doc. 1, ¶ 95-97).  Barrows alleged responded to Leaphart with a profanity and a racial epithet. (Id., ¶ 97). Leaphart also grieved this incident, but was dissatisfied with the outcome of that grievance. (Id., ¶¶ 100-105).[2] This disparate

_____

[2] Leaphart's complaint also describes a dispute he had with other staff regarding TB testing, but nothing in his pleadings links this dispute to any named defendant. (Id.,

collection of averments forms the basis for Leaphart's First Amendment retaliation claim against Defendant Barrows.

### B. **Facts Regarding Leaphart's Exhaustion of Grievances**

As a state inmate Leaphart had a legal obligation to fully exhaust administrative grievances before bringing legal claims against any correctional defendant. With respect to this legally mandated exhaustion requirement, the undisputed evidence reveals the following facts:

With regard to Leaphart's claims relating to lost property and Lieutenant Boal on February 12, 2020, Leaphart filed a grievance regarding this lost property. Leaphart's grievance did not make any allegations of retaliation but named Defendant Boal and sought reimbursement of $29.40 for this lost property. Leaphart withdrew this grievance on March 7, 2020, after he concedes that Lieutenant Boal replaced his lost foodstuffs. (Doc. 43, ¶¶ 4-11).

As for Major Barrows, it appears that Leaphart filed two relevant grievances during his confinement SCI Houtzdale. On March 4, 2020, Leaphart filed a grievance filed a grievance against Barrows which asserted claims regarding his alleged conversation with Barrows on March 4, 2020. Leaphart's grievance

---

¶¶ 105-107). Therefore, this allegation adds nothing to his claims against Defendants Boal or Barrows.

complained about the tone and tenor of his conversation with Barrows but did not seek monetary relief.

Leaphart filed a second grievance against Major Barrows on June 26, 2020, which alleged that Barrows retaliated against him by denying him a tablet, among other items. Leaphart did request monetary relief in this grievance. As to this grievance, the record reflects that the institution Program Review Committee approved Leaphart to have a tablet on July 16, 2020. Thus, at the time that Leaphart alleged that Barrows denied him access to a tablet, he had not yet been approved to possess a tablet, but he received such approval within a matter of days. (Id., ¶¶ 13-23).

It is against this factual backdrop that Leaphart brought these First Amendment retaliation claims against Defendants Boal and Barrows. (Doc. 1). The defendants have now moved for summary judgment on these claims, arguing that Leaphart has failed to fully and properly exhaust many of these claims and further contending that the claims fail on their merits. (Doc. 42). This summary judgment motion is fully briefed and is, therefore, ripe for resolution.

Upon consideration, for the reasons set forth below, this motion will be granted.

## III.   Discussion

### A. Motion for Summary Judgment – Standard of Review

The defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, which provides that the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Through summary adjudication, a court is empowered to dispose of those claims that do not present a "genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), and for which a trial would be "an empty and unnecessary formality." Univac Dental Co. v. Dentsply Int'l, Inc., 702 F.Supp.2d 465, 468 (M.D. Pa. 2010). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id., at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the

non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006), accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. Id., at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." Countryside Oil Co., Inc. v. Travelers Ins. Co., 928 F. Supp. 474, 482 (D.N.J. 1995). Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing

any supporting evidence of the denials." <u>Thimons v. PNC Bank, NA</u>, 254 F. App'x 896, 899 (3d Cir. 2007) (citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." <u>Fireman's Ins. Co. of Newark New Jersey v. DuFresne</u>, 676 F.2d 965, 968 (3d Cir. 1982); <u>see</u> <u>Sunshine Books, Ltd. v. Temple University</u>, 697 F.2d 90, 96 (3d Cir. 1982). "[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." <u>Lockhart v. Hoenstine</u>, 411 F.2d 455, 458 (3d Cir. 1969). Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." <u>Gans v. Mundy</u>, 762 F.2d 338, 341 (3d Cir. 1985) (citing <u>Ness v. Marshall</u>, 660 F.2d 517, 519 (3d Cir. 1981)).

Finally, it is emphatically not the province of the court to weigh evidence or assess credibility when passing upon a motion for summary judgment. Rather, in adjudicating the motion, the court must view the evidence presented in the light most favorable to the opposing party, <u>Anderson</u>, 477 U.S. at 255, and draw all reasonable inferences in the light most favorable to the non-moving party. <u>Big Apple BMW, Inc. v. BMW of North America, Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992). Where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true. <u>Id.</u> Additionally, the court is not to decide whether the evidence unquestionably favors one side or the other, or to make credibility

determinations, but instead must decide whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. <u>Anderson</u>, 477 U.S. at 252; <u>see also</u> <u>Big Apple BMW</u>, 974 F.2d at 1363. In reaching this determination, the Third Circuit has instructed that:

> To raise a genuine issue of material fact . . . the opponent need not match, item for item, each piece of evidence proffered by the movant. In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. It thus remains the province of the fact finder to ascertain the believability and weight of the evidence.

<u>Id.</u> In contrast, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (internal quotation marks omitted); <u>NAACP v. North Hudson Reg'l Fire & Rescue</u>, 665 F.3d 464, 476 (3d Cir. 2011).

## B. **Inmate First Amendment Retaliation Claims—Guiding Standards**

The legal guideposts which govern our consideration of Leaphart's First Amendment retaliation claims are familiar ones. As we have previously observed in this case, a prisoner claiming that prison officials have retaliated against him for exercising his constitutional rights must first prove: (1) the conduct in which he engaged was constitutionally protected; (2) he suffered adverse action at the hands of prison officials; and (3) his constitutionally protected conduct was a substantial

motivating factor in the defendants' conduct. Carter v. McGrady, 292 F.3d 152, 158 (3d Cir. 2002). With respect to the obligation to demonstrate that he suffered an adverse action, a plaintiff must demonstrate that he suffered action that "was sufficient to deter a person of ordinary firmness from exercising his rights." Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000). However, it is well settled that *de minimis* actions do not rise to the level of constitutionally cognizable retaliation. Thaddeus-X v. Blatter, 175 F.3d 378, 396 (6th Cir. 1999) ("It is not necessarily true, however, that every action, no matter how small, is constitutionally cognizable"). As one court has observed:

> The *de minimis* standard . . . achieves the proper balance between the need to recognize valid retaliation claims and the danger of "federal courts embroil[ing] themselves in every disciplinary act that occurs in state penal institutions." Woods, 60 F.3d at 1166. The purpose of allowing inmate retaliation claims under § 1983 is to ensure that prisoners are not unduly discouraged from exercising constitutional rights. See Crawford-El, 523 U.S. at 588 n. 10, 118 S. Ct. 1584. Some acts, though maybe motivated by retaliatory intent, are so *de minimis* that they would not deter the ordinary person from further exercise of his rights. Such acts do not rise to the level of constitutional violations and cannot form the basis of a § 1983 claim.

Morris v. Powell, 449 F.3d 682, 686 (5th Cir. 2006). See, e.g., Pope v. Bernard, No. 10 1443, 2011 U.S. App. LEXIS 2764, 2011 WL 478055, at *2 (1st Cir. Feb. 10, 2011).

The third essential element to a retaliation claim is that there be a causal link between the exercise of a constitutional right and the adverse action taken against the prisoner. <u>Rauser</u>, 241 F.3d at 333-34. To establish this third, and crucial, component to a constitutional retaliation claim, Leaphart must make an exacting showing. In this setting:

> To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. <u>See</u> <u>Krouse v. American Sterilizer Co.</u>, 126 F.3d 494, 503-04 (3d Cir. 1997); <u>Woodson v. Scott Paper Co.</u>, 109 F.3d 913, 920-21 (3d Cir. 1997). In the absence of that proof the plaintiff must show that from the "evidence gleaned from the record as a whole" the trier of the fact should infer causation. <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 281 (3d Cir. 2000).

<u>Lauren W. ex rel. Jean W. v. DeFlaminis</u>, 480 F.3d 259, 267 (3d Cir. 2007). Moreover, when examining these causation issues, we are specifically admonished that:

> A court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate. Consequently, a putative plaintiff by engaging in protected activity might be able to insulate himself from actions adverse to him that a public actor should take. The point we make is not theoretical as we do not doubt that public actors are well aware that persons disappointed with official decisions and actions frequently bring litigation against the actors responsible for the

decisions or actions in their individual capacities, and the actors surely would want to avoid such unpleasant events. Thus, it would be natural for a public actor to attempt to head off a putative plaintiff with the unwarranted expenditure of public funds. Courts by their decisions should not encourage such activity and, by enforcing the requirement that a plaintiff show causation in a retaliation case, can avoid doing so as they will protect the public actor from unjustified litigation for his appropriate conduct. In this regard we recognize that often public actors such as those in this case must make a large number of decisions in charged atmospheres thereby inviting litigation against themselves in which plaintiffs ask the courts to second guess the actors' decisions.

Id. at 267-68.

Mindful of these concerns, courts have in the past carefully scrutinized inmate claims of retaliation premised solely on circumstantial proof of a temporal proximity between the plaintiff's conduct and allegedly retaliatory acts. Indeed, this Court has spoken directly to the issue of what must be shown to state a valid complaint in this factual context, noting that:

To establish the causation element of a retaliation claim, a plaintiff must prove that his or her participation in a protected activity motivated the defendant to perform the retaliatory act. Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir. 2002); Meenan v. Harrison, Civ. A. No. 3:03-CV-1300, 2006 WL 1000032, at *4 (M.D. Pa. Apr. 4, 2006) (observing that a plaintiff must demonstrate that the exercise of First Amendment rights "played some substantial role" in the defendant's action). The temporal proximity of a retaliatory act to a plaintiff's exercise of his or her First Amendment rights is probative, but not dispositive, of the causation element. Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir. 2003); see also Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997) (stating that "temporal proximity

merely provides an evidentiary basis from which an inference can be drawn"). For temporal proximity alone to establish causation, the "timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred." Marasco, 318 F.3d at 512 (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997)) . . . [T]he Third Circuit Court of Appeals has suggested that a temporal proximity of two days is sufficient to establish causation, see Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 & n. 5 (3d Cir. 2000), whereas a temporal proximity of ten days is sufficient to establish causation only when accompanied by other evidence of . . . wrongdoing, Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 (3d Cir. 2003). This suggests that the temporal proximity must be measured in days, rather than in weeks or months, to suggest causation without corroborative evidence.

Conklin v. Warrington Tp., No. 06-2245, 2009 WL 1227950, *3 (M.D. Pa. April 30, 2009).

Applying this standard, courts in civil rights cases have frequently rebuffed speculative efforts to infer causation from temporal proximity when a span of weeks or months separated the plaintiff's constitutionally protected conduct from the defendants' alleged acts of retaliation.

## C. **The PLRA's Exhaustion Requirement**

In addition, a prisoner like Leaphart has a statutory duty to exhaust his administrative remedies within the prison system before proceeding to federal court. This legal duty is imposed upon inmates by the Prison Litigation Reform Act ("PLRA"), which provides that "[n]o action shall be brought with respect to prison conditions under . . . [42 U.S.C. § 1983], or any other Federal law, by a prisoner

15

confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Section 1997e's exhaustion requirement applies to a wide range of inmate complaints, including damages complaints like those made here. See Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004); Booth v. Churner, 206 F.3d 289 (3d Cir. 2000). While this exhaustion requirement is not a jurisdictional bar to litigation, this requirement is strictly enforced by the courts. This rigorous enforcement is mandated by a fundamental recognition that section 1997e's exhaustion requirement promotes important public policies. As the United States Court of Appeals for the Third Circuit has noted:

> Courts have recognized myriad policy considerations in favor of exhaustion requirements. They include (1) avoiding premature interruption of the administrative process and giving the agency a chance to discover and correct its own errors; (2) conserving scarce judicial resources, since the complaining party may be successful in vindicating his rights in the administrative process and the courts may never have to intervene; and (3) improving the efficacy of the administrative process. Each of these policies, which Congress seems to have had in mind in enacting the PLRA, is advanced by the across-the-board, mandatory exhaustion requirement in § 1997e(a). . . . [A] comprehensive exhaustion requirement better serves the policy of granting an agency the "opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court." Moreover, "even if the complaining prisoner seeks only money damages, the prisoner may be successful in having the [prison] halt the infringing practice" or fashion some other remedy, such as returning personal property, reforming personal property policies, firing an abusive prison guard, or creating a better screening process for hiring such guards. And when a prisoner obtains some measure of affirmative relief, he may elect not to pursue his claim for damages. In either case, local actors are given the chance to address local problems, and at the very least, the time frame for the prisoner's damages is frozen or the

isolated acts of abuse are prevented from recurring. An across-the-board exhaustion requirement also promotes judicial efficiency. . . . Moreover, even if only a small percentage of cases settle, the federal courts are saved the time normally spent hearing such actions and multiple appeals thereto. . . . In cases in which inmate-plaintiffs exhaust their remedies in the administrative process and continue to pursue their claims in federal court, there is still much to be gained. The administrative process can serve to create a record for subsequent proceedings, it can be used to help focus and clarify poorly pled or confusing claims, and it forces the prison to justify or explain its internal procedures. All of these functions help courts navigate the sea of prisoner litigation in a manner that affords a fair hearing to all claims.

Nyhuis v. Reno, 204 F.3d 65, 75-76 (3d Cir. 2000) (citations omitted).

Because of the important policies fostered by this exhaustion requirement, it has been held that there is no futility exception to section 1997e's exhaustion requirement. Id. Instead, courts have typically required across-the-board administrative exhaustion by inmate plaintiffs who seek to pursue claims in federal court.

Moreover, courts have also imposed a procedural default component on this exhaustion requirement, holding that inmates must fully satisfy the administrative requirements of the inmate grievance process before proceeding into federal court. Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004). Applying this procedural default standard to section 1997e's exhaustion requirement, courts have concluded that inmates who fail to fully, or timely, complete the prison grievance process are barred from subsequently litigating claims in federal court. See, e.g., Booth v. Churner, 206 F.3d 289 (3d Cir. 2000); Bolla v. Strickland, 304 F. App'x 22 (3d Cir. 2008); Jetter

17

v. Beard, 183 F. App'x 178 (3d Cir. 2006). Furthermore, applying this procedural

default component to the exhaustion requirement, Spruill v. Gillis, 372 F.3d 218 (3d

Cir. 2004), it has been held that:

> As for the failure to [] identify named defendants on the grievance form,
> . . . to the extent the identity of a defendant was "a fact relevant to the
> claim," . . . in the absence of any justifiable excuse, a[n] inmate's failure
> to properly identify a defendant constituted a failure to properly exhaust
> his administrative remedies under the PLRA.

Williams v. Pennsylvania Dep't of Corrections, 146 F. App'x 554, 557 (3d Cir.

2005). Thus, "it is clear, regardless of the purpose of the requirement, that Spruill

requires the prisoner-grievant-plaintiff to name in the grievance those he eventually

sues, upon pain of procedural default." Hemingway v. Ellers, Civ. No. 07-1764,

2008 WL 3540526, *11 (M.D. Pa. Aug. 12, 2008). Likewise it has been held that a

state inmate "procedurally default[s] his claim for money damages by failing to

request such relief in his grievance." Wright v. Sauers, 729 F. App'x 225, 227 (3d

Cir. 2018). See Piazza v. Kauffman, No. 1:21-CV-00380, 2023 WL 2742740, at *7

(M.D. Pa. Mar. 31, 2023).

This broad rule favoring full exhaustion admits of one, narrowly defined

exception. If the actions of prison officials directly caused the inmate's procedural

default on a grievance, the inmate will not be held to strict compliance with this

exhaustion requirement. See Camp v. Brennan, 219 F.3d 279 (3d Cir. 2000).

However, case law recognizes a clear "reluctance to invoke equitable reasons to

excuse [an inmate's] failure to exhaust as the statute requires." Davis v. Warman, 49

F. App'x 365, 368 (3d Cir. 2002). Thus, an inmate's failure to exhaust will only be

excused "under certain limited circumstances," Harris v. Armstrong, 149 F. App'x

58, 59 (3d Cir. 2005), and an inmate can defeat a claim of failure to exhaust only by

showing "he was misled or that there was some extraordinary reason he was

prevented from complying with the statutory mandate." Davis, 49 F.App'x at 268;

see also Brown v. Croak, 312 F.3d 109, 110 (3d Cir. 2002) (assuming that prisoner

with failure to protect claim is entitled to rely on instruction by prison officials to

wait for outcome of internal security investigation before filing grievance); Camp v.

Brennan, 219 F.3d 279, 281 (3d Cir. 2000) (exhaustion requirement met where

Office of Professional Responsibility fully examined merits of excessive force claim

and uncontradicted correctional officers impeded filing of grievance).

### D. **The Defendants' Motion for Summary Judgment will be Granted.**

Judged against these benchmarks, we find that Leaphart's First Amendment

retaliation claims against Defendants Boal and Barrows fail as a matter of law. At

the outset, to the extent that these constitutional tort claims rest upon alleged verbal

harassment of Leaphart by the correctional defendants this claim fails for a single,

simple reason. It has been held that, while verbal harassment of an inmate may be

deplorable and unprofessional, such verbal harassment, standing alone, does not

constitute an adverse action for purposes of a First Amendment retaliation claim.

Marten v. Hunt, 479 F. App'x 436, 438 (3d Cir. 2012); see Lang v. Vangorder, No. 1:19-CV-719, 2019 WL 7104624, at *4 (M.D. Pa. Dec. 23, 2019).

Further, with respect to Lieutenant Boal, Leaphart's complaint encounters two other insurmountable obstacles. First, Leaphart has failed to fully grieve this complaint as he is required to do under the PLRA. Thus, while it is clear that Leaphart initially filed a grievance relating to the loss of his commissary foodstuffs, it is also uncontested that he withdrew that grievance after Lieutenant Boal made arrangements to provide this inmate with replacement food items. Since Leaphart did not fully and properly grieve this incident, he is now precluded from bringing a constitutional tort claim based upon this episode.

Nor can Leaphart save this constitutional claim by arguing that he withdrew his grievance under duress. What Leaphart wishes to describe as improper duress was simply the consummation of an agreement that the plaintiff admits he made with Lieutenant Boal. Under the terms of this agreement, the lieutenant replaced Leaphart's lost commissary items in return for Leaphart's withdrawal of this grievance. Given the good faith which Leaphart acknowledges was exhibited by Lieutenant Boal who replaced the $29.40 in food items that had been lost, Leaphart was obliged to live up to his end of his agreement and withdraw this grievance.

Moreover, and more fundamentally, nothing in the undisputed facts surrounding this episode provides a legal or factual basis for a constitutional First

Amendment retaliation claim. The undisputed facts reveal that Defendant Boal assured Leaphart that he would respect and return his commissary items when Lepahart entered the RHU. Regrettably, once Leaphart was approved to possess such items in the RHU his commissary goods could not be located, but Lieutenant Boal kept his promise to this inmate by delivering replacement foodstuffs to him. It simply cannot be said that the actions of Boal, who kept his promise to Leaphart, somehow rise to the level of an actionable First Amendment retaliation. Indeed, even if we cast this conduct in a light most favorable to Leaphart, as we are required to do, the most that can be said is that Leaphart experienced several days' delay before these food items were delivered to his cell. In our view, a few days' delay in receiving these food items is an inconvenience of such a *de minimis* nature that it simply cannot form the basis of a constitutional tort. Therefore, this claim against Defendant Boal fails and must be dismissed.

Similar obstacles bar Leaphart's pursuit of First Amendment retaliation claims against Major Barrows. With respect to this defendant, it is evident that Leaphart's principal complaint relates to alleged verbal abuse by Barrows. While this alleged conduct is to be condemned, as a matter of law it simply does not constitute the type of adverse action necessary for a First Amendment retaliation claim. Marten, 479 F. App'x at 438.

Moreover, a review of Leaphart's grievance history reveals that he only lodged one pertinent grievance against Barrows relating to these events which sought damages. Therefore, the procedural default aspects of the PLRA now limit him to that one properly grieved claim which related to Barrows' alleged denial of a tablet to Leaphart on June 26, 2020. Yet, the undisputed evidence shows that Leaphart was not authorized by the institution's PRC to possess a tablet at that time. Moreover, it is entirely undisputed that by July 16, 2020, some twenty days later, Leaphart was approved to possess a tablet.

On these uncontested facts, Leaphart's sole claim against Defendant Barrows which survives the PLRA's exhaustion requirement fails for at least two reasons. First, Barrows cannot be faulted for denying Leaphart access to a tablet in June of 2020 since Leaphart was not yet authorized to possess this device at that time. Simply put, denying an inmate something he may not possess cannot be seen as an adverse action for purposes of a First Amendment retaliation claim. In any event, it is now clear that Leaphart had access to this tablet some twenty days later, after the PRC approved his receipt of this device. This brief delay in obtaining access to a tablet is an inconvenience of such a *de minimis* nature that it simply cannot form the basis of a constitutional tort. Therefore, this claim against Defendant Barrows also fails and must be dismissed.

Finally, even if we concluded that Leaphart had stated some colorable constitutional claim, we would nonetheless be obliged to dismiss these claims on qualified immunity grounds. The doctrine of qualified immunity protects government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Id. Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). "Thus, so long as an official reasonably believes that his conduct complies with the law, qualified immunity will shield that official from liability." Sharp v. Johnson, 669 F.3d 144, 159 (3d Cir. 2012) (citing Pearson, 555 U.S. at 244). Although qualified immunity is generally a question of law that should be considered at the earliest possible stage of proceedings, a genuine dispute of material fact may preclude summary judgment on qualified immunity. Giles v. Kearney, 571 F.3d 318, 325-26 (3d Cir. 2009).

Qualified immunity shields officials from liability for civil damages brought pursuant to section 1983 "so long as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known." Bland v. City of Newark, 900 F.3d 77, 83 (3d Cir. 2018) (quoting Mullenix v. Luna, 577 U.S. 7, 11 (2015)). The official seeking qualified immunity has the burden of establishing their entitlement to the affirmative defense. Halsey v. Pfeiffer, 750 F.3d 273, 288 (3d Cir. 2014) (citing Reedy v. Evanson, 615 F.3d 197, 223 (3d Cir. 2010)). To determine whether an official is entitled to the affirmative defense of qualified immunity for a section 1983 claim, a court must determine (1) whether the official violated a constitutional right and, if so, (2) whether the right was clearly established. Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled in part by Pearson, 555 U.S. at 236 (permitting federal courts to exercise discretion in deciding which of the two Saucier prongs should be addressed first).

A right is clearly established if "every reasonable official would have understood that what he is doing violates that right." Mullenix, 577 U.S. at 11. To be clearly established, there does not have to be a case that is directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." Id. (quoting Ashcroft v. Al-Kidd, 563 U.S. 731, 741 (2011)). In determining whether a right is clearly established, courts must not define the right "at a high level of generality." Id. (quoting Al-Kidd, 563 U.S. at 742, 131 S.Ct. 2074.) Rather, the analysis should focus on "whether the violative nature of particular conduct is clearly established." Id. (quoting Al-Kidd, 563 U.S. at 742).

On this score, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. It is the plaintiff who bears the initial burden of demonstrating that the constitutional right at issue was clearly established at the time of the claimed violation. See Davis v. Scherer, 468 U.S. 183, 197 (1984); Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997). To determine whether a right is clearly established, the court may look to cases from the Supreme Court, controlling circuit precedent, or "a robust consensus of cases of persuasive authority" from other circuit courts. Porter v. Pa. Dep't of Corrs., 974 F.3d 431, 449 (3d Cir. 2020) (quoting Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist., 877 F.3d 136, 142 (3d Cir. 2017)).

In our view, no Supreme Court decision, controlling circuit precedent, or robust consensus of persuasive authority supports the notion that Defendant Boal violated Leaphart's clearly established constitutional rights when he replaced the plaintiff's missing commissary items days after Leaphart grieved the loss of those items. Likewise, no clearly established legal authority would have placed Barrows on notice that he was violating the First Amendment when it is alleged that he denied Leaphart permission to possess an article which this inmate had not yet been authorized to possess. Therefore, the doctrine of qualified immunity also applies here and compels dismissal of these claims.

**IV.**   **<u>Conclusion</u>**

For the foregoing reasons, the defendants' motion for summary judgment

(Doc. 42) will be GRANTED.

An appropriate order follows.

<u>*S/ Martin C. Carlson*</u>
Martin C. Carlson
United States Magistrate Judge

DATED: June 6, 2023