## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HAROLD LEAPHART, | : | Civil No. 1:21-CV-1293 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | (Magistrate Judge Carlson) |
| | : | |
| WILLIAM CAMPBELL, et al., | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

## I.   Introduction

This *pro se* prisoner civil rights lawsuit case comes before us on a motion for summary judgment filed by seven correctional staff at the State Correctional Institution, Huntingdon—William Campbell, J.B. Merrits, J. Kirsch, E. Long, C.J. Love, Booher, and Sosak. (Doc. 45). With respect to these defendants, the plaintiff, Harold Leaphart, has filed a complaint alleging that these defendants violated his right under the Eighth Amendment to be free from cruel and unusual punishment in a number of ways in the course of an April 20, 2019, cell extraction at the prison.

With respect to this episode the parties' positions are marked by stark, irreconcilable conflicts, with Leaphart describing a course of sustained brutality and

medical deliberate indifference by the defendants and the defendants insisting that they used the minimum force necessary to remove Leaphart from his cell and then took care to ensure that he received timely and appropriate medical treatment.

There is, however, a third, immutable witness—the unblinking eye of a prison video which captured some, but not all, of the events surrounding this cell extraction. Upon consideration of the factual background of these claims, viewed through the lens of this incontrovertible video evidence, for the reasons set forth below we will grant this motion for summary judgment, in part, and deny the motion, in part.

## II.     Statement of Facts and of the Case[1]

### A. Factual Background Regarding the April 20, 2019, Cell Extraction

Harold Leaphart is a state inmate and a prior litigant in this court. In the instant case Leaphart is suing seven correctional officials at the State Correctional Institution (SCI) Huntingdon for various alleged Eighth Amendment violations arising out of a planned use of force to extract this inmate from his cell on April 20, 2019.

---

[1] This statement of facts is derived from the parties' submissions to the extent that those submissions are supported by independent and uncontroverted evidence, including the cell extraction video.

With respect to this incident the parties' competing narratives begin with a rare point of consensus. All parties agree that on April 20, 2019, Leaphart was scheduled to be moved from his cell because he was placed on a pre-hearing custody status due to a misconduct citation which had been lodged against him. From this single point of agreement, the parties' narratives swiftly and materially diverge.

For his part, Leaphart alleges that, prior to this planned cell transfer, Lieutenant William Campbell came to his cell. Leaphart alleges that Campbell used racial epithets and implied threats of harm to the plaintiff in connection with the upcoming cell transfer, threats which Leaphart says frightened him and caused him to decide that he would resist being moved from his cell.[2]

Shortly after this alleged verbal exchange, according to Leaphart Lieutenant Campbell returned to his cell with a cell extraction team consisting of Correctional Officers Merrits, Kirsch, Long, Booher, and Sosak. The cell extraction team was accompanied by another correctional officer, C.O. Love, whose role was to serve as a videographer, accurately recording what transpired during this planned use of

---

[2] Leaphart's description of this verbal encounter is supported in part by a declaration from another inmate, Daryl Johnson. (Doc. 55 Ex. E-1). There is no countervailing affidavit from Lieutenant Campbell specifically rebutting this claim.

force. There was also a prison nurse, LPN Householder, standing by to render medical aid as needed.

According to Leaphart when the cell extraction team arrived at his cell he initially declined to be handcuffed out of fear of harm. Correctional Officer Merrits then sprayed Leaphart multiple times with a painful chemical agent, oleoresin capsaicin, or OC spray. (Doc. 54). The cell extraction team then entered Leaphart's cell and subdued him. In the course of subduing and handcuffing Leaphart the plaintiff alleges that Defendants Kirsch, Long, Booher, and Sosak "were slapping, punching, kneeing and kicking my face, head and body without any legitimate penological justification for doing so." (Id., ¶ 12).  As for Correctional Officer Merrits, Leaphart avers that Merrits "kneeled on my lower back and slid his forearm under my chin and temporarily placed me in a chokehold without any legitimate penological justification for doing so." (Id., ¶ 11). In the meanwhile, Leaphart contends that Lieutenant Campbell and the videographer, Correctional Officer Long, did nothing to curb this use of force. (Id., ¶ 13).

Once he was handcuffed and removed from his cell Leaphart alleges that he was taken to the Restricted Housing Unit, (RHU), where a prison nurse, LPN Householder, rinsed out his eyes, but ignored his requests for further medical

treatment. Leaphart further asserts that he complained to Lieutenant Campbell that he was suffering from severe pain and needed a shower, but these requests were also ignored. (Id., ¶¶ 15-17). According to Leaphart he then remained housed in D-block for some five days without receiving medical care. (Id., ¶ 18).

For their part, the defendants cast this cell extraction in an entirely different light. While acknowledging that Correctional Officer Merrits deployed OC spray against Leaphart six times in the span of a few minutes while Leaphart was confined in his cell, (Doc. 46, ¶¶ 10-40), the defendants insist that they took this action only after Leaphart threw some unidentified liquid at them. The defendants also assert that they used the minimum amount of force that was reasonably necessary to gain Leaphart's compliance with the cell transfer. In addition, the defendants specifically deny choking, striking, beating, or kicking Leaphart. Moreover, according to the defendants, Leaphart received medical treatment from LPN Householder immediately upon his removal from the cell. Further, according to the defendants Leaphart did not complain about further immediate medical needs, and an examination conducted by Nurse Householder revealed no apparent injuries to the plaintiff. Finally, the defendants note that, to the extent Leaphart is alleging that he was denied follow up care after this cell transfer, the named defendants no longer

5

oversaw his care and custody, and played no role in these events which transpired following his cell transfer.

With the parties' competing factual narratives cast in these irreconcilable fashions, we have turned to the dispassionate perspective of the cell extraction video to gain a clearer understanding of what transpired on April 20, 2019. That video does not depict the conversation which allegedly took place between Leaphart and Lieutenant Campbell prior to the planned cell extraction, but it does capture from one perspective, the events surrounding the cell extraction and transfer of Leaphart to the RHU. The video reveals that when the cell extraction team arrived at Leaphart's cell, he refused to be handcuffed. While the video's perspective does not initially allow us to clearly see Leaphart inside the cell, the plaintiff can be heard warning staff that they could be splashed and then throwing an unidentified liquid out of his cell.

At this juncture, and for approximately the next three minutes, Officer Merrits can be seen repeatedly deploying OC spray inside Leaphart's cell while staff instruct Leaphart to submit to handcuffing. Leaphart's actions cannot be clearly discerned from the camera's perspective, but he does not comply with the instructions to submit to handcuffing. Instead, Leaphart can be heard complaining that the officers

6

are trying to harm him. Moreover, other inmates on the cell block can be heard coughing as the OC spray is used as many as six times by staff.

After this extended use of the OC spray did not gain Leaphart's compliance, the cell extraction team entered the cell and took Leaphart to the floor. At this point the camera's perspective is somewhat obscured due to the crush of bodies inside the confines of the cell. However, nothing on the video depicts Officers Kirsch, Long, Booher, and Sosak striking, beating, or kicking Leaphart. Instead, the officers can be seen restraining the plaintiff and heard telling Leaphart to stop resisting. The actions taken by Officer Merrits are not clearly visible. For his part, Leaphart can be heard denying that he is resisting the officers and calling out that he cannot breathe because someone is laying on him.

After approximately two minutes, Leaphart was subdued, placed in restraints, removed from his cell, and placed in a restraint chair. He was then transported to a holding cell. In the holding cell Nurse Householder decontaminated Leaphart's eyes. Leaphart did not appear to be in any other acute distress and cannot be heard requesting medical assistance for any injuries. Leaphart's prison garb is then removed, he is dressed in a smock, and is taken to another cell. At this cell, the nurse once again examines and photographs Leaphart's head, hands, legs, and torso.

During this transport, and while in this cell, Leaphart does not voice complaints or request medical attention, as he has alleged in this lawsuit. However, after he is placed in the cell Nurse Householder asks him if he has any injuries and he responds in the affirmative. The nurse then examines Leaphart through the cell door, noting that he has no visible scrapes, bleeding, or marks. Having found no signs of other injuries, Nurse Householder tells Leaphart that he should report any injuries to medical staff if he experiences medical problems. Leaphart is then videotaped for a brief period in this cell where he can be seen spitting, wiping his eyes, and waving his arms as if trying to dispel the chemical agent.

Taken together, these contrasting narratives and the video's immutable but somewhat limited perspective define for us the operative nucleus of facts in this case.

### B. Facts Regarding Leaphart's Exhaustion of Grievances

As a state inmate Leaphart had a legal obligation to fully exhaust administrative grievances before bringing legal claims against any correctional defendant. With respect to this legally mandated exhaustion requirement, the undisputed evidence reveals that on April 30, 2019, Leaphart lodged a grievance against the members of the cell extraction team arising out of this April 20, 2019, incident. (Doc. 46-9). In this grievance Leaphart alleged that the cell extraction team

used excessive force when removing him from his cell. In particular, Leaphart claimed that prison staff "repeatedly" sprayed him with "large quantities of OC spray" until he "could not breathe." (Id.) Leaphart further claimed that the members of the cell extraction team "rained down punches and kicks all over my body." (Id.) While Leaphart's grievance leveled these excessive force claims against the entre cell extraction team, and requested monetary damages, the grievance did not present any claims relating to denial of medical treatment by staff. (Id.)

It is against this backdrop that Leaphart brought these Eighth Amendment claims against Defendants Campbell, Merrits, Kirsch, Long, Love, Booher and Sosak, (Doc. 1). The defendants have now moved for summary judgment on these claims, arguing that Leaphart has failed to fully and properly exhaust his grievances on a number of these claims and further contending that the claims fail on their merits. (Doc. 45). This summary judgment motion is fully briefed and is, therefore, ripe for resolution.

Upon consideration, for the reasons set forth below, this motion will be granted, in part, and denied, in part, as follows: First, any claims premised upon alleged verbal harassment of the plaintiff are DISMISSED. Second, all medical deliberate indifference claims are DISMISSED. Third, the excessive force claims

against Defendants Kirsch, Long, Booher, and Sosak are DISMISSED. However, the summary judgment motion is DENIED with respect to excessive force claims against Defendant Merrits arising out of allegedly prolonged use of chemical agents or positional asphyxia of the plaintiff, and as to these claims the motion is also DENIED with respect to Defendant Campbell.

## III.   <u>Discussion</u>

### A. <u>Motion for Summary Judgment – Standard of Review</u>

The defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, which provides that the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Through summary adjudication, a court is empowered to dispose of those claims that do not present a "genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), and for which a trial would be "an empty and unnecessary formality." <u>Univac Dental Co. v. Dentsply Int'l, Inc.</u>, 702 F.Supp.2d 465, 468 (M.D. Pa. 2010). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A

dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006), accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. Id. at 252; see also Matsushita Elec. Indus. Co. v.

Zenith Radio Corp., 475 U.S. 574, 586 (1986). In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." Countryside Oil Co., Inc. v. Travelers Ins. Co., 928 F. Supp. 474, 482 (D.N.J. 1995). Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." Thimons v. PNC Bank, NA, 254 F. App'x 896, 899 (3d Cir. 2007) (citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." Fireman's Ins. Co. of Newark New Jersey v. DuFresne, 676 F.2d 965, 968 (3d Cir. 1982); see Sunshine Books, Ltd. v. Temple University, 697 F.2d 90, 96 (3d Cir. 1982). "[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." Lockhart v. Hoenstine, 411 F.2d 455, 458 (3d Cir. 1969). Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon

bare assertions, conclusory allegations or suspicions." <u>Gans v. Mundy</u>, 762 F.2d 338, 341 (3d Cir. 1985) (citing <u>Ness v. Marshall</u>, 660 F.2d 517, 519 (3d Cir. 1981)).

Finally, it is emphatically not the province of the court to weigh evidence or assess credibility when passing upon a motion for summary judgment. Rather, in adjudicating the motion, the court must view the evidence presented in the light most favorable to the opposing party, <u>Anderson</u>, 477 U.S. at 255, and draw all reasonable inferences in the light most favorable to the non-moving party. <u>Big Apple BMW, Inc. v. BMW of North America, Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992). Where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true. <u>Id.</u> Additionally, the court is not to decide whether the evidence unquestionably favors one side or the other, or to make credibility determinations, but instead must decide whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. <u>Anderson</u>, 477 U.S. at 252; <u>see also</u> <u>Big Apple BMW</u>, 974 F.2d at 1363. In reaching this determination, the Third Circuit has instructed that:

> To raise a genuine issue of material fact . . . the opponent need not match, item for item, each piece of evidence proffered by the movant. In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its

13

> opponent. It thus remains the province of the fact finder to ascertain the believability and weight of the evidence.

Id. In contrast, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation marks omitted); NAACP v. North Hudson Reg'l Fire & Rescue, 665 F.3d 464, 476 (3d Cir. 2011).

### B. **Inmate Eighth Amendment Retaliation Claims—Guiding Standards**

The legal guideposts which govern our consideration of Leaphart's Eighth Amendment retaliation claims are familiar ones. In conducting this legal analysis, we must be mindful of the fact that Leaphart advances a panoply of Eighth Amendment claims against the defendants in his complaint. Indeed, in our view, Leaphart alleges, with varying degrees of clarity, at least four different constitutional claims under the Eighth Amendment, asserting at various times that prison staff violated his Eighth Amendment rights by: (1) using excessive force against him; (2) failing to intervene in the use of excessive force by others; (3) displaying deliberate indifference to Smith's medical needs; and (4) by engaging in verbal threats and harassment of the plaintiff.

Each of these Eighth Amendment claims is, in turn, judged against settled legal principles, principles which set precise and exacting standards for asserting a constitutional infraction. Yet, all the various claims are governed by the same overarching and animating constitutional benchmarks. As the United States Court of Appeals for the Third Circuit has observed:

> The Eighth Amendment protects against infliction of "cruel and unusual punishment." However, "not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny." Whitley v. Albers, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). "After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Id. (citation and internal quotations omitted). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." Id.
>
> Resolution of an Eighth Amendment claim therefore "mandate[s] an inquiry into a prison official's state of mind." Wilson v. Seiter, 501 U.S. 294, 299, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). Two considerations define that inquiry. We must first determine if the deprivation was sufficiently serious to fall within the Eighth Amendment's zone of protections. Id. at 298, 111 S.Ct. 2321. If not, our inquiry is at an end. However, if the deprivation is sufficiently serious, we must determine if the officials acted with a sufficiently culpable state of mind. Id. In other words, we must determine if they were motivated by a desire to inflict unnecessary and wanton pain. "What is necessary to establish an 'unnecessary and wanton infliction of pain ...' varies according to the

nature of the alleged constitutional violation." Hudson v. McMillian,
503 U.S. 1, 5, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

Fuentes v. Wagner, 206 F.3d 335, 344–45 (3d Cir. 2000).

With these general guiding tenets in mind, we turn to a consideration of the
controlling legal benchmarks governing Leaphart's specific Eighth Amendment
claims.

### 1. **Excessive Force Claims**

In this case Leaphart's principal legal claim involves allegations that the
members of the cell extraction team used unconstitutionally excessive force against
him on April 20, 2019. Eighth Amendment excessive force claims are governed by
familiar legal standards which typically entail a showing of some subjective intent
to injure. In an excessive force case, where "prison officials stand accused of using
excessive physical force in violation of the Cruel and Unusual Punishments Clause,
the core judicial inquiry is that set out in Whitley[v. Albers, 475 U.S. 312, 106 S.Ct.
1078, 89 L.Ed.2d 251 (1986) ]: whether force was applied in a good-faith effort to
maintain or restore discipline, or maliciously and sadistically to cause harm."
Hudson v. McMillian, 503 U.S. 1, 6–7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

Thus, the keystone to analysis of an Eighth Amendment excessive force claim
often involves issues of motivation—whether force was applied in a good-faith

16

effort to maintain or restore discipline, or maliciously and sadistically to cause harm.

Hudson v. McMillian, 503 U.S. 1, 6–7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). However, the issue of whether excessive force was used is one which, in proper circumstances, can be determined as a matter of law. In such cases, summary judgment is appropriate when "it appears that the evidence, viewed in the light most favorable to the plaintiff, will [not] support a reliable inference of wantonness in the infliction of pain." Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir.2000) (quoting Whitley, 475 U.S. at 322). There are several factors that a court examines in determining whether a correctional officer has used excessive force in violation of the Eighth Amendment, including:

> (1)"the need for the application of force"; (2) "the relationship between the need and the amount of force that was used"; (3) "the extent of injury inflicted"; (4) "the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them"; and (5) "any efforts made to temper the severity of a forceful response."

Id. at 106 (quoting Whitley, 475 U.S. at 322).

When considering such claims, the reasonableness of a particular use of force is often dependent upon factual context and must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 396–7, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

17

Moreover, in the context of prison excessive force claims, in determining "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," Hudson v. McMillian, 503 U.S. 1, 6–7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992), "even if we concede [that an inmate] has established at most that prison officials over-reacted to the disturbance that he caused ..., any such over-reaction would still fall short of supporting a finding that prison officials acted 'maliciously and sadistically to cause harm.' " Fuentes v. Wagner, 206 F.3d 335, 346 (3d Cir.2000).

In assessing such claims in a case where an encounter is captured on videotape we are also mindful of the fact that when "videotape refutes [an inmate's] assertion that defendant[s] used excessive force," or when the "video shows that [an inmate] did not suffer any physical distress, and a medical report indicates that he had no visible swelling or injuries," we should conclude "viewing the evidence in the light most favorable to [the inmate that], no reasonable finder of fact could view the video of the incident and determine that [defendants] acted maliciously and sadistically," and may enter summary judgment on an excessive force claim. Tindell v. Beard, 351 F. App'x 591, 596 (3d Cir.2009). In short, we do not need to entertain a factual conflict which rests upon a "visible fiction"; that is, a version of events that is refuted

by video evidence.  Instead, we should "view[] the facts in the light depicted by the

videotape." Scott v. Harris, 550 U.S. 372, 381 (2007).

In this case, Leaphart's Eighth Amendment excessive force claims involve, in

large measure, what the plaintiff describes as an excessive use of OC spray by prison

staff. The Eighth Amendment applies to the use of such chemical agents by prison

officials against inmates and:

> "[I]t is a violation of the Eighth Amendment for prison officials to use
> mace or other chemical agents in quantities greater than necessary or
> for the sole purpose of punishment or the infliction of pain." Soto v.
> Dickey, 744 F.2d 1260, 1270 (7th Cir. 1984); see also Thomas v.
> Bryant, 614 F.3d 1288, 1311 (11th Cir. 2010) (noting that it is a
> violation of the Eighth Amendment "where chemical agents are used
> unnecessarily, without penological justification, or for the very purpose
> of punishment or harm"); Thomas v. Comstock, 222 F. App'x 439, 442
> (5th Cir. 2007) (noting that the use of chemical agents can violate the
> Eighth Amendment when done so as a "malicious or sadistic
> application of force"); Williams v. Benjamin, 77 F.3d 756, 763 (4th Cir.
> 1996) (citing Soto for the same conclusion); cf. Jones v. Shields, 207
> F.3d 491, 496 (8th Cir. 2000) (noting that "a limited application of
> [pepper spray] ... constitutes a 'tempered response by prison officials'
> when compared to other forms of force").

Roberts v. Luther, No. 1:21-CV-00958, 2021 WL 5233318, at *7 (M.D. Pa. Nov.

10, 2021).

## 2.  **Failure to Intervene Claims**

In conjunction with his Eighth Amendment excessive force claim, Leaphart also alleges that two defendants—Lieutenant Campbell and Correctional Officer Love—violated the Eighth Amendment by failing to intervene on his behalf. As we have previously noted for Leaphart:

> [C]orrections officers may be liable under § 1983 for failing to intervene in an instance of excessive force if they had a reasonable opportunity to do so. A valid failure to intervene claim requires: (1) the officer had a duty to intervene; (2) the officer had the opportunity to intervene; and (3) the officer failed to intervene. Smith, 293 F.3d at 650-51.

Leaphart v. Campbell, No. 1:21-CV-1293, 2022 WL 1158255, at *7 (M.D. Pa. Apr. 19, 2022). Thus, a failure to intervene claim will only lie in a limited set of circumstances and:

> An officer's failure to intervene can [only] be the basis of an Eighth Amendment violation under § 1983 if the officer, upon witnessing another's use of excessive force against a prisoner, "had a reasonable opportunity to intervene and simply refused to do so." Smith, 293 F.3d at 650. However, an officer is only liable "if there is a realistic and reasonable opportunity to intervene." Id. at 651.

Fears v. Beard, 532 F. App'x 78, 82 (3d Cir. 2013).

### 3.  <u>Medical Deliberate Indifference Claims</u>

In this case, Leaphart also contends that the correctional defendants violated the Eighth Amendment by displaying deliberate indifference to his medical needs following this cell extraction. Leaphart faces an exacting burden in advancing this Eighth Amendment claim against prison officials in their individual capacities. To sustain such a claim, the plaintiff must:

> [M]eet two requirements: (1) the deprivation alleged must be, objectively, sufficiently serious; and (2) the prison official must have a sufficiently culpable state of mind. <u>Farmer v. Brennan</u>, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quotation marks and citations omitted). In prison conditions cases, "that state of mind is one of 'deliberate indifference' to inmate health or safety." <u>Id.</u> "Deliberate indifference" is a subjective standard under <u>Farmer</u>-the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety.

<u>Beers-Capitol v. Whetzel,</u>256 F.3d 120, 125 (3d Cir. 2001). These principles apply with particular force to Eighth Amendment claims premised upon inadequate medical care. In the medical context, a constitutional violation under the Eighth Amendment occurs only when state officials are deliberately indifferent to an inmate's serious medical needs. <u>Estelle v. Gamble</u>, 429 U.S. 97, 105 (1976). To establish a violation of his constitutional right to adequate medical care in a prison setting, Leaphart is required to point to evidence that demonstrates both (1) a serious

medical need, and (2) acts or omissions by prison officials that indicate deliberate indifference to that need. Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).

Deliberate indifference to a serious medical need involves the "unnecessary and wanton infliction of pain." Estelle, 429 U.S. at 104. Such indifference may be evidenced by an intentional refusal to provide care, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, denial of reasonable requests for treatment that results in suffering or risk of injury, Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993), or by "persistent conduct in the face of resultant pain and risk of permanent injury." White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990). However, it is also clear that the mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, is not actionable as an Eighth Amendment claim because medical malpractice is not a constitutional violation. Estelle, 429 U.S. at 106.

There is a necessary corollary to this principle, limiting the reach of the Eighth Amendment in a prison medical setting. In a case such as this, where the plaintiff's complaint reflects that an inmate received some level of medical care, it is also well-established that non-medical correctional staff may not be "considered deliberately indifferent simply because they failed to respond directly to the medical complaints

of a prisoner who was already being treated by the prison doctor." Durmer, 991 F.2d

at 69. The rationale for this rule has been aptly explained by the Third Circuit in the

following terms:

> If a prisoner is under the care of medical experts . . ., a non-medical
> prison official will generally be justified in believing that the prisoner
> is in capable hands. This follows naturally from the division of labor
> within a prison. Inmate health and safety is promoted by dividing
> responsibility for various aspects of inmate life among guards,
> administrators, physicians, and so on. Holding a non-medical prison
> official liable in a case where a prisoner was under a physician's care
> would strain this division of labor. Moreover, under such a regime, non-
> medical officials could even have a perverse incentive *not* to delegate
> treatment responsibility to the very physicians most likely to be able to
> help prisoners, for fear of vicarious liability. Accordingly, we conclude
> that, absent a reason to believe (or actual knowledge) that prison
> doctors or their assistants are mistreating (or not treating) a prisoner, a
> non-medical prison official . . . will not be chargeable with the Eighth
> Amendment scienter requirement of deliberate indifference.

Spruill v. Gillis, 372 F.3d 218, 236 (3d. Cir. 2004).

### 4.  **Verbal Harassment**

Finally, liberally construed, Leaphart's complaint may be leveling an Eighth

Amendment verbal harassment claim against Lieutenant Campbell based upon what

Leaphart has described as verbally harassing and threatening behavior by the

lieutenant prior to this cell extraction. However, a plaintiff typically may not premise

an Eighth Amendment claim solely on alleged verbal harassment. In this regard: "It is well settled that verbal harassment of a prisoner, although deplorable, does not violate the Eighth Amendment." Robinson v. Taylor, 204 F. App'x 155, 156 (3d Cir. 2006) (collecting cases).

### C. **The PLRA's Exhaustion Requirement**

In addition, a prisoner like Leaphart has a statutory duty to exhaust his administrative remedies within the prison system before proceeding to federal court. This legal duty is imposed upon inmates by the Prison Litigation Reform Act ("PLRA"), which provides that "[n]o action shall be brought with respect to prison conditions under . . . [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Section 1997e's exhaustion requirement applies to a wide range of inmate complaints, including damages complaints like those made here. See Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004); Booth v. Churner, 206 F.3d 289 (3d Cir. 2000). While this exhaustion requirement is not a jurisdictional bar to litigation, this requirement is strictly enforced by the courts. This rigorous enforcement is mandated by a fundamental

24

recognition that section 1997e's exhaustion requirement promotes important public

policies. As the United States Court of Appeals for the Third Circuit has noted:

> Courts have recognized myriad policy considerations in favor of exhaustion requirements. They include (1) avoiding premature interruption of the administrative process and giving the agency a chance to discover and correct its own errors; (2) conserving scarce judicial resources, since the complaining party may be successful in vindicating his rights in the administrative process and the courts may never have to intervene; and (3) improving the efficacy of the administrative process. Each of these policies, which Congress seems to have had in mind in enacting the PLRA, is advanced by the across-the-board, mandatory exhaustion requirement in § 1997e(a). . . . [A] comprehensive exhaustion requirement better serves the policy of granting an agency the "opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court." Moreover, "even if the complaining prisoner seeks only money damages, the prisoner may be successful in having the [prison] halt the infringing practice" or fashion some other remedy, such as returning personal property, reforming personal property policies, firing an abusive prison guard, or creating a better screening process for hiring such guards. And when a prisoner obtains some measure of affirmative relief, he may elect not to pursue his claim for damages. In either case, local actors are given the chance to address local problems, and at the very least, the time frame for the prisoner's damages is frozen or the isolated acts of abuse are prevented from recurring. An across-the-board exhaustion requirement also promotes judicial efficiency. . . . Moreover, even if only a small percentage of cases settle, the federal courts are saved the time normally spent hearing such actions and multiple appeals thereto. . . . In cases in which inmate-plaintiffs exhaust their remedies in the administrative process and continue to pursue their claims in federal court, there is still much to be gained. The administrative process can serve to create a record for subsequent proceedings, it can be used to help focus and clarify poorly pled or confusing claims, and it forces the prison to justify or explain its

25

internal procedures. All of these functions help courts navigate the sea of prisoner litigation in a manner that affords a fair hearing to all claims.

Nyhuis v. Reno, 204 F.3d 65, 75-76 (3d Cir. 2000) (citations omitted).

Because of the important policies fostered by this exhaustion requirement, it has been held that there is no futility exception to section 1997e's exhaustion requirement. Id. Instead, courts have typically required across-the-board administrative exhaustion by inmate plaintiffs who seek to pursue claims in federal court.

Moreover, courts have also imposed a procedural default component on this exhaustion requirement, holding that inmates must fully satisfy the administrative requirements of the inmate grievance process before proceeding into federal court. Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004). Applying this procedural default standard to section 1997e's exhaustion requirement, courts have concluded that inmates who fail to fully, or timely, complete the prison grievance process are barred from subsequently litigating claims in federal court. See, e.g., Booth v. Churner, 206 F.3d 289 (3d Cir. 2000); Bolla v. Strickland, 304 F. App'x 22 (3d Cir. 2008); Jetter v. Beard, 183 F. App'x 178 (3d Cir. 2006).

Notably, when considering the PLRA's exhaustion requirement in an Eighth Amendment setting courts have focused on the factual context of the claim. For

example, recognizing that Eighth Amendment allegations arise in a wide variety of settings, it has been held that the proper exhaustion of an Eighth Amendment failure to protect claim does not excuse the failure to timely raise and exhaust grievances concerning an Eighth Amendment medical deliberate indifference claim. See Wood v. Russell, 255 F. Supp. 3d 498, 507 (D. Del. 2017).

### D. **The Defendants' Motion for Summary Judgment will be Granted, in Part, and Denied, in Part.**

Applying these legal yardsticks, we find that some, but not all, of Leaphart's Eighth Amendment claims fail as a matter of law.

#### 1.   **Leaphart's Verbal Harassment Claims Fail**.

At the outset we have liberally construed Leaphart's complaint to include a verbal threats and harassment claim leveled against Lieutenant Campbell relating to what Leaphart described as a verbal exchange that took place prior to the April 20, 2019, cell extraction. However, to the extent that the plaintiff alleges that he was verbally harassed by Defendant Campbell, given that it is "well settled that verbal harassment of a prisoner, although deplorable, does not violate the Eighth Amendment," Robinson v. Taylor, 204 F. App'x 155, 156 (3d Cir. 2006), this verbal harassment allegation fails to state a constitutional claim. Mimms v. U.N.I.C.O.R., 386 F. App'x 32, 35 (3d Cir. 2010) (Verbal harassment of a prisoner, without more,

does not violate the Eighth Amendment); Lindsey v. O'Connor, 327 F. App'x 319, 321 (3d Cir. 2009) (Verbal harassment of a prisoner, although distasteful, does not violate the Eighth Amendment). Therefore, any Eighth Amendment claims premised solely upon verbal harassment must be dismissed.

### 2. **Leaphart May Not Maintain an Eighth Amendment Medical Deliberate Indifference Claim Against These Non-Medical Correctional Staff.**

Likewise, Leaphart's Eighth Amendment medical deliberate indifference claims fails as a matter of law. In our view this claim encounters three insurmountable legal obstacles. First, a fair reading of Leaphart's prison grievance reveals that, while the grievance leveled excessive force claims against the entire cell extraction team, and requested monetary damages, it did not allege the denial of medical treatment by staff. (Doc. 46-9). Given that that the proper exhaustion of one form of Eighth Amendment claim does not excuse the failure to timely raise and exhaust an Eighth Amendment medical deliberate indifference claim, see Wood, 255 F. Supp. 3d at 507, Leaphart has procedurally defaulted this medical deliberate indifference claim and he may not pursue such claims at this time.

More fundamentally, this claim fails on its merits given the immutable facts disclosed by the cell extraction video. In his complaint Leaphart has sued non-

medical correctional staff, the prison cell extraction team. Notably, he has not named the one medical professional who accompanied that team, LPN Householder, as a defendant in this lawsuit. This charging decision on Leaphart's part now has substantive significance, since we find, consistent with settled caselaw, that these non-medical staff were entitled to rely upon and defer to the medical judgment of LPN Householder, who assessed Leaphart's condition following the cell extraction and found no evidence of any significant injuries. Simply put, the correctional staff did what they should have done. They deferred to the judgment of a medical professional on medical matters. As a matter of law, following this course does not constitute deliberate indifference on the part of correctional staff. Spruill, 372 F.3d at 236. Therefore, this claim fails as to the non-medical correctional defendants and must be dismissed.

Finally, we note that Leaphart cannot sustain a medical indifference claim against any of the defendants for yet another reason. LPN Householder, who accompanied the cell extraction team, was not indifferent to Leaphart's medical needs. Quite the contrary, she treated Leaphart, decontaminating his eyes. She then inspected him for other injuries and found none. Finally, she clearly instructed Leaphart to report any medical issues to staff so he could be treated. Thus, the level

of care provided by LPN Householder plainly rebuts any allegations of deliberate indifference to Leaphart's medical needs on April 20, 2019. Moreover, to the extent that Leaphart complains about the care he received in the ensuing five days after his cell extraction, the simple answer is that none of the defendants played any role in his confinement and care after April 20, 2019. Therefore, no deliberate indifference claims may lie against these defendants.

### 3. **Leaphart's Excessive Force Claims Against Defendants Kirsch, Long, Booher, and Sosak Fail as a Matter of Law.**

Leaphart has also lodged a specific Eighth Amendment excessive force claim against defendants Kirsch, Long, Booher, and Sosak, asserting that they "rained down punches and kicks all over my body." (Doc. 46-9). In evaluating the legal sufficiency of this claim we begin, as we must, with a consideration of the dispassionate perspective of the cell extraction video. Thus, we may not indulge a claim of a factual conflict which rests upon a "visible fiction"; that is, a version of events which is refuted by video evidence.  Instead, the Supreme Court has enjoined us to "view[] the facts in the light depicted by the videotape." Scott, 550 U.S. at 381. Moreover, in assessing such claims in a case where an encounter is captured on videotape we are mindful of the fact that when "videotape refutes [an inmate's] assertion that defendant[s] used excessive force," or when the "video shows that [an

inmate] did not suffer any physical distress, and a medical report indicates that he had no visible swelling or injuries," we should conclude "viewing the evidence in the light most favorable to [the inmate that], no reasonable finder of fact could view the video of the incident and determine that [defendants] acted maliciously and sadistically," and should enter summary judgment on an excessive force claim. Tindell v. Beard, 351 F. App'x at 596.

Adopting this analytical paradigm, we find that the unblinking eye of the prison video completely contradicts Leaphart's claim that these defendants repeatedly beat, struck, or kicked the plaintiff. While the video shows these officers participating in the effort to subdue and handcuff Leaphart, there is simply no evidence that they struck or kicked him. Thus, the declarations submitted by Leaphart and his fellow inmate, Daryl Johnson, are contradicted on this score by incontrovertible video evidence. Therefore, we are compelled to reject the "visible fiction" described by Leaphart and must "view[] the facts in the light depicted by the videotape." Scott, 550 U.S. at 381. When we do so, these claims fail as a matter of law and will be dismissed.

31

4. **Disputed Issues of Fact Preclude Summary Judgment on Some of the Excessive Force Claims Brought Against Defendants Merrits and Campbell.**

While the undisputed video evidence clearly resolves the excessive force claims leveled against Defendants Kirsch, Long, Booher, and Sosak, the same degree of clarity does not exist with respect to Defendants Merrits and Campbell. As we view it, as to these defendants two excessive force claims remain. First, it is alleged that Defendant Merrits, at the direction of Lieutenant Campbell, repeatedly deployed OC spray against Leaphart while he was confined within his cell prior to the cell extraction. In addition, Leaphart has alleged that Merrits used excessive force against him by choking him while the cell extraction team was atop him placing him in restraints.

When we consider these Eighth Amendment claims, we are cautioned that any reliance upon the cell extraction video:

> is tempered by one crucial corollary. Any assessment of the probative value of video evidence must take into account that the camera, while an immutable witness, can only describe events from the particular perspective of the video's lens. Thus, the camera only allows us to see what the camera observed and recorded, and our assessment of the evidence must be undertaken through the prism of the camera's perspective, subject to all of the vagaries and limitations of that perspective. This fact has led commentators to caution courts to refrain from a reflexive reliance on equivocal video evidence when reaching ultimate legal conclusions. *See* Jessica Silbey, *Cross–Examining Film,*

32

8 U. Md. L.J. Race, Religion, Gender & Class 17 (2008); Martin A. Schwartz et. al., *Analysis of Videotape Evidence in Police Misconduct Cases,* 25 Touro L. Rev. 857 (2009).

Breeland v. Cook, No. 3:12-CV-2511, 2014 WL 820167, at *4 (M.D. Pa. Mar. 3, 2014).

The instant case illustrates why such caution is sometimes necessary. Turning first to Leaphart's claims that Defendant Merrits, acting at Lieutenant Campbell's direction, engaged in excessive force when he used OC spray against the plaintiff some six times in the span of three minutes while Leaphart was confined in his cell, it is clear that the use of such chemical agents:

> is not "a per se violation of the Eighth Amendment...." Soto v. Dickey, 744 F.2d 1260, 1270 (7th Cir.1984). Rather, "[t]he use of mace, tear gas or other chemical agent of the like nature when reasonably necessary to prevent riots or escape or to subdue recalcitrant prisoners does not constitute cruel and inhuman punishment." Soto v. Dickey, 744 F.2d 1260, 1270 (7th Cir.1984). See also Michenfelder v. Sumner, 860 F.2d 328, 336 (9th Cir.1988) (policy allowing use of taser guns on inmate who refused to submit to a strip search does not constitute cruel and unusual punishment); Spain v. Procunier, 600 F.2d 189, 195 (9th Cir.1979) (the use of tear gas "in small amounts may be a necessary prison technique if a prisoner refuses after adequate warning to move from a cell or upon other provocation presenting a reasonable possibility that slight force will be required."); Clemmons v. Greggs, 509 F.2d 1338, 1340 (5th Cir.1975) (the use of tear gas when reasonably necessary to subdue recalcitrant prisoners does not violate the Eighth Amendment)

Passmore v. Ianello, 528 F. App'x 144, 147–48 (3d Cir. 2013).

33

Yet, while the use of chemical agents like OC spray does not constitute a per se violation of the Eighth Amendment:

> [I]t has long been recognized that "[i]t is a violation of the Eighth Amendment for prison officials to use mace or other chemical agents in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain." Soto v. Dickey, 744 F.2d 1260, 1270 (7th Cir. 1984); see also Foulk v. Charrier, 262 F.3d 687, 701-02 (8th Cir. 2001) (stating application of pepper spray when inmate being compliant can constitute Eighth Amendment violation).

Goenaga v. MacDonald, No. 3:14-CV-2496, 2017 WL 1178072, at *5 (M.D. Pa. Mar. 30, 2017).

Therefore, in this setting, context is crucial when determining whether a use of some chemical agents was appropriate or unconstitutionally excessive. And recognizing this fact, we find that the prison video, with its limited perspective, lacks the definitive context needed for a summary judgment determination of this claim. As we have observed that video shows that when the cell extraction team first arrived at Leaphart's cell, he refused to be handcuffed. While the video's perspective does not initially allow us to clearly see Leaphart inside the cell, the plaintiff can be heard warning staff that they could be splashed and then throwing an unidentified liquid out of his cell.

34

This conduct may well have justified an initial use of OC spray. However, what follows is a prolonged application of this chemical agent over approximately the next three minutes, during which time Officer Merrits can be seen repeatedly deploying OC spray inside Leaphart's cell while staff instruct Leaphart to submit to handcuffing.  What is crucially missing from the video evidence is any indication of the threat or recalcitrance posed by Leaphart during this extended exposure to chemical agents. Simply put, Leaphart's actions cannot be clearly discerned from the camera's perspective. Moreover, while he does not comply with the instructions to submit to handcuffing, Leaphart can be heard complaining that the officers are trying to harm him. Moreover, other inmates on the cell block can be heard coughing as the OC spray is used as many as six time by staff. With our assessment of the evidence confined to the prism of the camera's perspective, subject to all the vagaries and limitations of that perspective, we cannot reach a determination as a matter of law concerning this use of force since critical aspects of Leaphart's conduct that might have justified, or refuted, this continued and prolonged application of force simply are not visible. Therefore, in the absence of immutable video evidence, we are left with the parties' competing factual claims which define a disputed issue of fact regarding the need for the continued application of this force.

35

Likewise, the inherent limitations in the video's perspective prevent us from reaching any definitive conclusion regarding Leaphart's assertion that Officer Merrits engaged in an excessive use of force by choking and asphyxiating the plaintiff while he lay on his cell floor with the cell extraction team atop him. In this regard, positional asphyxia of a detained person plainly raises immediate and grave safety concerns which would trigger Eighth Amendment scrutiny. Further, while the video clearly shows that the other cell extraction officers are not striking or kicking Leaphart, Officer Merrits' actions cannot be clearly observed through the physical scrum which occurred in the cell. What can be observed through the video, though, is that Leaphart cries out that he cannot breathe because someone is laying on him. Thus, the video itself is ambiguous with respect to Leaphart's asphyxia claim against Defendant Merrits, although the audio portion of the recording contains a contemporaneous claim by Leaphart that he cannot breathe. Since the video evidence is unclear and the audio recording actually lends some support to Leaphart's assertion that he was being choked, this claim simply cannot be resolved on summary judgment.

Finding that these two excessive force claims survive as to Officer Merrits, we also conclude that Lieutenant Campbell is not entitled to summary judgment on

either of these specific claims. The video evidence discloses that Lieutenant Campbell oversaw the cell extraction team, and it appears that he ordered the use of the chemical agents in this case. Therefore, while Campbell does not have direct physical contact with Leaphart, he may nonetheless be liable for any alleged Eighth Amendment violation in his supervisory capacity.

Supervisory civil rights liability exists only in certain specific and narrowly defined circumstances. Thus, a claim of a constitutional deprivation cannot be premised merely on the fact that the named defendant was a prison supervisor when the incidents set forth in the complaint occurred. Quite the contrary, to state a constitutional tort claim the plaintiff must show that the supervisory defendants actively deprived him of a right secured by the Constitution. Morse v. Lower Merion School Dist., 132 F.3d 902 (3d Cir. 1997); see also Maine v. Thiboutot, 448 U.S. 1 (1980). Constitutional tort liability is personal in nature and can only follow personal involvement in the alleged wrongful conduct shown through specific allegations of personal direction or of actual knowledge and acquiescence in the challenged practice. Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997). In particular, with respect to prison supervisors it is well-established that: "A[n individual government] defendant in a civil rights action must have personal involvement in

37

the alleged wrongdoing; liability cannot be predicated solely on the operation of *respondeat superior*. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)).

This is an exacting and strict standard of proof which must be met to sustain a supervisory liability claim in a civil rights case. Nonetheless, viewing the evidence in a light most favorable to the plaintiff, as we must at this juncture, that evidence would permit an inference of personal direction or actual knowledge and acquiescence by Lieutenant Campbell at least with respect to excessive force claims relating to the prolonged use of OC spray. Therefore, Lieutenant Campbell is not entitled to summary judgment on this Eighth Amendment claim.[3]

### 5. **The Failure to Intervene Claim Against Defendant Love Will be Dismissed.**

Finally, Leaphart's complaint asserts an Eighth Amendment failure to intervene claim against Defendant Love, the correctional videographer who recorded

---

[3] Finding that a colorable supervisory liability claim lies here with respect to Lieutenant Campbell, we do not deem it necessary to reach Leaphart's alternate argument that this defendant is also liable under the Eighth Amendment for his alleged failure to intervene.

the April 20, 2019, forced cell extraction. As to Defendant Love, Leaphart proceeds

solely on an Eighth Amendment failure to intervene claim because the undisputed

evidence shows that Officer Love had no physical contact with the plaintiff. We find,

however, that this claim fails as a matter of law in light of what the video depicts.

As we have noted, a failure to intervene claim will only lie in a limited set of

circumstances and:

> An officer's failure to intervene can [only] be the basis of an Eighth
> Amendment violation under § 1983 if the officer, upon witnessing
> another's use of excessive force against a prisoner, "had a reasonable
> opportunity to intervene and simply refused to do so." Smith, 293 F.3d
> at 650. However, an officer is only liable "if there is a realistic and
> reasonable opportunity to intervene." Id. at 651.

Fears v. Beard, 532 F. App'x 78, 82 (3d Cir. 2013).

Recognizing that a culpable failure to intervene only exists when the

correctional officer had a reasonable and realistic opportunity to intervene in what

was recognized as an excessive use of force, we find that the cell extraction video,

which accurately depicts Officer Love's perspective on this episode, does not meet

these essential elements of a failure to intervene claim. As we have noted the sole

remaining, colorable Eighth Amendment excessive force claims in this case relate

to matters which *cannot* be discerned on the cell extraction video Indeed, these

claims survive precisely because Officer Love's video sheds no full light on what

transpired. Since the video accurately reflects what Officer Love observed but provides no clear indication regarding whether excessive force was applied, it cannot be said that Officer Love had a realistic and reasonable opportunity to intervene and curtail an apparent constitutional infraction. In short, the very ambiguity of the video, which Leaphart relies upon to avoid summary judgment on some excessive force claims, undermines his failure to intervene claim against Officer Love. Therefore, this claim, and defendant, will also be dismissed.

## IV.   __Conclusion__

For the foregoing reasons, the defendants' motion for summary judgment (Doc. 45) will be GRANTED, in part, and DENIED, in part as follows:

First, any claims premised upon alleged verbal harassment of the plaintiff are DISMISSED.

Second, all medical deliberate indifference claims are DISMISSED.

Third, the excessive force claims against Defendants Kirsch, Long, Booher, and Sosak are DISMISSED.

The summary judgment motion is DENIED with respect to excessive force claims against Defendant Merrits arising out of allegedly prolonged use of chemical

agents or positional asphyxia of the plaintiff, and as to these claims the motion is also DENIED with respect to Defendant Campbell.

An appropriate order follows.

_S/ Martin C. Carlson_
Martin C. Carlson
United States Magistrate Judge

DATED: June 29, 2023